889 A.2d 1197

**OFFICE OF DISCIPLINARY COUNSEL, Petitioner**

v.

**Akim Frederic CZMUS, Respondent.**

Supreme Court of Pennsylvania.

Argued Oct. 19, 2004.

Decided Dec. 30, 2005.

---

24

Richard Hernandez, Philadelphia, for Office of Disciplinary Counsel.

James Patrick Leonard, Philadelphia, for Akim Frederic Czmus.

Before CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## OPINION

Justice EAKIN.

Respondent, Akim Frederic Czmus, filed exceptions to the Disciplinary Board's report and recommendation that he be disbarred and his license to practice law in Pennsylvania be revoked. For the reasons discussed below, we hold respondent's misconduct and continuous pattern of deceit and dishonesty warrants disbarment.

From 1970 to 1977, respondent attended Brown University and earned a medical degree. He was licensed to practice medicine in New York after completing his residency in internal medicine at Thomas Jefferson University in Philadelphia; he also completed a residency in ophthalmology surgery. From 1981 to 1984, respondent engaged in the private practice of medicine in New York City and served as Assistant Clinical

Professor of Ophthalmology at New York Medical College, St. Vincent's Hospital and Medical Center, and the New York Eye and Ear Infirmary.

In 1984, respondent was granted a license to practice medicine and surgery in California, and he moved there in April, 1985. His subsequent applications to Verdugo Hills Hospital and Glendale Adventist Medical Center in Glendale, California, falsely represented he was certified by the American Board of Ophthalmology.

In October, 1986, the California Attorney General commenced a disciplinary action against respondent as a result of the false certificates submitted to the two Glendale hospitals. Respondent stipulated to the violations and agreed to have his California medical license revoked in exchange for an agreement that the revocation would be stayed for five years, respondent would be placed on probation, and he would complete a course in medical ethics. The following year, the New York medical licensing board initiated a reciprocal disciplinary proceeding.

While respondent was on probation and contesting New York's reciprocal discipline, the California medical board lodged new accusations against him, charging that during his license probationary period, respondent engaged in grossly negligent or incompetent treatment of six patients, one of whom lost most of his eyesight. The board further alleged respondent knowingly made false documents and altered surgical treatment records to hide his inept treatment of the patients. On May 18, 1992, respondent endorsed a Stipulation for Surrender of Certificate, stating he would not contest the allegations, was suffering from an extended illness which caused his negligent care of the patients, and was no longer engaged in the practice of medicine. He agreed to surrender his California medical license. This stipulation was accepted by California's medical licensing board. He also surrendered his New York medical license.

In 1992, while respondent was finalizing his medical license debacles, he was accepted at Temple University School of

Law. In his application to the law school, respondent failed to disclose he attended medical school, received medical licenses, lived in California, worked as a physician, had disciplinary proceedings in California and New York, and had both states' medical licenses revoked; respondent omitted all history related to his practice of medicine. While attending law school, respondent submitted a resumé to a law firm falsely representing he held medical licenses in California and New York.

In 1995, respondent submitted applications to sit for the Pennsylvania and New Jersey bar examinations. Respondent failed to include in either bar application any mention of his medical education, career, or disciplinary proceedings. Additionally, respondent falsely represented he lived in Delaware and worked for Kennard Lab Associates during the time he was actually working in California as a physician; Kennard Lab Associates has never been licensed to do business in Delaware and the address respondent provided for this business was fraudulent. Respondent's Pennsylvania bar application contained the following verification whereby he attested, under penalty of perjury, that his submission contained no omissions or falsehoods:

I verify that the statements of facts made by me in this application are true and correct and that they are made subject to the penalties of 18 Pa.C.S. § 4904 relating to unsworn falsifications to authorities. I further verify that I have not omitted any facts or matters pertinent to this application.

Application for Admission to the Bar of the Commonwealth of Pennsylvania, 4/9/95, at 5. Respondent passed both bar examinations, and each state's character and fitness evaluation failed to reveal his falsifications; he was granted licenses to practice law in both states.

In 1998, New Jersey attorney disciplinary authorities learned respondent was a former physician with a record of professional misconduct and discipline. Respondent was questioned by an investigator with the New Jersey Office of Attorney Ethics about the discrepancies between his New Jersey bar application and the record evidence of his career as

a physician and medical disciplinary proceedings. Respondent conceded he made errors on the application, but attributed them to confusion; he alleged he thought he was to list only undergraduate schools and degrees, and claimed he did not list his medical disciplinary proceedings because he thought each had been dismissed and administratively expunged. Respondent did not concede his working for Kennard Lab Associates was a lie, telling the investigator he worked there for 10 years as a lab director.

The New Jersey Office of Attorney Ethics filed a complaint against respondent for making material misrepresentations and omissions on his New Jersey bar application and to the investigator. Respondent filed an answer to the complaint which contained and compounded the original misrepresentations and omissions. About eight months later, respondent amended his answer, correcting some of the falsehoods but still fabricating some of his history.

In November, 1999, respondent began seeing Dr. Gary Kramer, a licensed psychiatrist, who diagnosed respondent as suffering from multiple psychiatric disorders—bipolar disorder, panic disorder, obsessive compulsive personality disorder, and depression. Dr. Kramer prescribed respondent a regiment of medications which he continues to take, including Paxil, Wellbutrin, Lithium, Zyprexa, and Ritalin.

On January 20, 2000, respondent's attorney referred him to Dr. Robert Sadoff, a forensic psychiatrist, for a psychological evaluation. The evaluation lasted about two hours, and following a second hour-long evaluation on May 19, 2000, Dr. Sadoff opined:

> It is the combination of all these physical and mental conditions that have affected Mr. Czmus' judgment such that he panicked at the time of filling out the application for the [New Jersey] bar and did not respond appropriately to the two questions regarding his previous history as a physician, his having attended medical school and his having lost his license to practice medicine both in California and in New York. He was so ashamed, humiliated and embar-

rassed by the memory of such failures that he could not respond appropriately to the questions as it would dredge up previous memories that he has been trying to repress and to hide from.

Letter From Dr. Sadoff to Carl Poplar, Esq., 5/22/00, at 13. Dr. Sadoff also referred respondent to Dr. Gerald Cooke, a neurophysiologist, who performed a series of psychological tests. Dr. Sadoff reviewed the results of the tests and the opinion of Dr. Kramer and ultimately agreed with Dr. Kramer's diagnosis.

The New Jersey disciplinary hearing was held June 26, 2000, and Drs. Kramer and Sadoff testified to respondent's mental infirmities. At the hearing, respondent offered the following false testimony:

1. He worked for William Kennard in Delaware for the time period he worked and lived in California.

2. He had an independent contractor relationship with Kennard Lab Associates.

3. He had provided complete and accurate information to Dr. Sadoff and Dr. Cooke.

4. The reason he provided false information on his New Jersey bar application was because he only had a short time to complete the application.

Report and Recommendation of the Disciplinary Board, 3/18/04, at 9–10.

Because respondent was untruthful to his treating psychiatrists during counseling sessions and treatment interviews, Drs. Sadoff and Kramer compounded respondent's untruthful testimony. Eventually, respondent conceded at the hearing he made the above misrepresentations because he had spent three years in law school and was afraid if he revealed his past and was denied permission to sit for the bar exam, he would lose those three years of his life. By order dated December 4, 2001, the New Jersey Supreme Court found respondent had violated two rules of professional conduct and revoked his license to practice law; he was barred from seeking readmission for two years.

On April 3, 2001, the Pennsylvania Office of Disciplinary Counsel (ODC) filed a petition for discipline charging respondent with violations of Pennsylvania Rules of Professional Conduct 8.1(a) and 8.4(b)-(d).[1] In his answer, respondent admitted making the serial falsehoods and "that at the time such statements were made he knew that each such statement was false." Respondent's Answer to Petition for Discipline, at 3. By way of mitigation, respondent offered the following explanation: "At the time, [he] was suffering under a severe disability resulting from an organic brain dysfunction caused by encephalitis, severe panic attacks and an undiagnosed Bipolar Disorder which medical condition was a causal factor in his actions." *Id.*

On June 5, 2001, the Disciplinary Board appointed a three-member hearing committee to hear respondent's case. A prehearing conference was held October 2, 2001, where respondent offered Dr. Sadoff as an expert, who opined there was a causal connection between respondent's extended, egre-

---

1. At the time of respondent's proceedings, these rules were as follows:
 Rule 8.1 Bar Admission and Disciplinary Matters
 (a) A lawyer is subject to discipline if the lawyer has made a materially false statement in, or if the lawyer has deliberately failed to disclose a material fact requested in connection with, the lawyer's application for admission to the bar or any disciplinary matter. Pa.R.P.C. 8.1(a). This rule was amended, effective 1/1/05, to state:
 An applicant for admission to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not:
 (a) knowingly make a false statement of material fact; or
 (b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this Rule does not require disclosure of information otherwise protected by Rule 1.6.
 Pa.R.P.C. 8.1 (as amended 1/1/05).
 Rule 8.4 Misconduct
 It is professional misconduct for a lawyer to:
 * * *
 (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;
 (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
 (d) engage in conduct that is prejudicial to the administration of justice....
 Pa.R.P.C. 8.4(b)-(d).

gious conduct and his existing psychiatric, emotional, and relationship problems. N.T. Hearing, 10/2/01, at 145–46. Dr. Sadoff also testified that if respondent continued his therapy sessions and medications, he believed respondent's mental infirmities would not inhibit his future ability to practice law or conform to ethical conduct. *Id.*, at 165–66. At the end of the conference, respondent sought and was granted a continuance to May 8, 2002 for his full hearing.

A day before his hearing was to begin, respondent endorsed a Joint Stipulation of Law and Facts admitting all the factual averments contained in the disciplinary complaint, and conceded: "[a]s a result of his conduct, as set forth above, [r]espondent violated RPC 8.1(a), RPC 8.4(b), RPC 8.4(c) and RPC 8.4(d)." Joint Stipulation of Law and Facts, 5/7/02, at 13. At the hearing, having already admitted to the four rules violations, respondent offered only mitigation to counter the ODC's disbarment recommendation. Respondent presented the testimony of Dr. Kramer who testified to respondent's weekly psychiatric visits, mental diagnoses, and progress under treatment. Dr. Sadoff also testified and endorsed Dr. Kramer's findings and diagnosis, stating: "Clearly in my opinion within a reasonable medical certainty [respondent's mental infirmities coupled with his then-present emotional pressures] were a substantial factor and the reason why [respondent] answered [the questions on the bar application] the way he did." N.T. Hearing, 5/8/02, at 146.

"[M]indful of the serious nature of [r]espondent's misconduct in [providing] false information on his bar application in numerous areas in a calculated attempt to conceal misconduct as a medical doctor and related disciplinary action …," as well as respondent's deceit with regard to his New Jersey bar application, the Hearing Committee recommended respondent's Pennsylvania license to practice law be suspended for five years followed by a two-year probationary period. Report of Hearing Committee 1.03, 6/10/03, at 21–22. The Hearing Committee rejected a disbarment sanction, finding it significant that respondent had not been previously disciplined by the Pennsylvania Disciplinary Board, his fellow attorneys

testified they were confident practicing with him, and respondent had "establish[ed] the existence of numerous psychiatric disorders which were causally connected to the misconduct at issue in this Commonwealth...." *Id.* (following *Office of Disciplinary Counsel v. Braun*, 520 Pa. 157, 553 A.2d 894 (1989)).

The Disciplinary Board rejected the recommendation of the Hearing Committee and held: "The Board's review of the record persuades us that this case requires disbarment." Report and Recommendation of the Disciplinary Board, 3/8/04, at 18. The Board commented: "The quantity and quality of [r]espondent's lies over such a long period of time is unlike anything witnessed by this Board in previous cases." *Id.* "Despite the mitigation evidence presented, [r]espondent's actions are too egregious to permit a recommendation of less than disbarment." *Id.,* at 19.

Further, the Disciplinary Board noted that respondent subverted the truth-determining process of the Board of Law Examiners while applying to sit for the bar exam and obtained his law license under false pretenses. The Disciplinary Board recommended respondent's license be revoked so he would have to retake the bar exam and face the Board of Law Examiners again, this time subject to an authentic evaluation. *Id.,* at 20. ("Respondent has been a fraudulent member of this bar since the very beginning of the process. It seems justified in this particular instance that [r]espondent be required to start from the very beginning if he desires to practice law in Pennsylvania.").

 Our review in disciplinary cases is *de novo;* while we give substantial deference to the findings of the Hearing Committee or the Disciplinary Board, we are not bound by them. *Office of Disciplinary Counsel v. Chung*, 548 Pa. 108, 695 A.2d 405, 407 (1997). The primary purpose of our lawyer discipline system in Pennsylvania is to protect the public, preserve the integrity of the courts, and deter unethical conduct. *See In re Iulo*, 564 Pa. 205, 766 A.2d 335, 339 (2001). "Truth is the cornerstone of the judicial system; a license to

practice law requires allegiance and fidelity to truth." *Office of Disciplinary Counsel v. Surrick*, 561 Pa. 167, 749 A.2d 441, 449 (2000) (citation omitted). "Whenever an attorney is dishonest, that purpose is served by disbarment." *Office of Disciplinary Counsel v. Grigsby*, 493 Pa. 194, 425 A.2d 730, 733 (1981).

This Court has synthesized the distinction between disbarment and suspension as:

> The essential difference between suspension and disbarment is that although both sanctions involve the withdrawal of the privilege of practicing law, an attorney who is suspended may resume practice at the end of the period of suspension upon demonstration of his fitness to practice, whereas an attorney who is disbarred may not apply for admission to the bar for a period of five years, and in disbarment, there is no basis for an expectation by the disbarred attorney of the right to resume practice at some future point in time. When reinstatement is sought by the disbarred attorney, the threshold question must be whether the magnitude of the breach of trust would permit the resumption of practice without a detrimental effect upon "the integrity and standing of the bar or the administration of justice nor subversive of the public interest."

*In the Matter of Renfroe*, 548 Pa. 101, 695 A.2d 401, 403 (1997) (quotation omitted).

The Disciplinary Board may consider as potential mitigation an expert's opinion establishing a causal connection between the misconduct and an underlying mental infirmity; *Braun*, at 895–96; however, some conduct is simply too egregious and requires disbarment to protect the integrity of the profession and judicial tribunals. *See Renfroe*, at 404 (accepting causal connection between misconduct during addiction but still mandating disbarment).

In *Braun*, the respondent was brought before the Disciplinary Board for forging his client's signature on 15 checks and converting a total of $1,962.94 for his own use. While Braun ultimately replaced the funds, the ODC instituted disciplinary

proceedings and recommended disbarment. Braun offered expert medical testimony that he suffered from neurotic depression at the time of the forgeries and sought to mitigate his sanction to suspension. This Court determined that Braun established a sufficient causal connection between his psychiatric disorder and the underlying professional misconduct, and the "[p]sychiatric disorder [was] an appropriate consideration as a mitigating factor in a disciplinary proceeding...." *Braun*, at 895–96. This Court followed the Board's recommendation that the established mental disorder and requisite causal connection to the misconduct, coupled with the underlying facts of Braun's case, justified suspension rather than disbarment. *Id.*, at 896.

 This Court commented on the effect a lawyer's dishonesty and false swearing had on the legal profession:

We are reminded of the comment of Daniel Webster: "Tell me a man is dishonest, and I will answer he is no lawyer. He cannot be, because he is careless and reckless of justice; the law is not in his heart, is not the standard and rule of his conduct." D. Webster, Speech to the Charleston, South Carolina Bar, May 10, 1847.

*Grigsby*, at 733 (citation omitted). Respondent has admitted that for 18 years (from 1982–2000), he was incapable of telling the truth in official documents or at official proceedings when it was in his perceived personal interest not to do so. Although the Hearing Committee found this pattern of deceit disturbing, it held *Braun* obligated only a sanction of suspension. We find respondent's level of fraud, which transcended professions and jurisdictions, requires disbarment. *See Renfroe*, at 403–04 ("The power of a court to disbar an attorney should be exercised with great caution, but there should be no hesitation in exercising it when it clearly appears that it is demanded for the protection of the public.") (quoting *Office of Disciplinary Counsel v. Keller*, 509 Pa. 573, 506 A.2d 872, 879 (1986)).

Here, this Court will not reward respondent with the presumption of reinstatement after five years since his admit-

tance to the bar was predicated on fraudulent precepts in the first instance. Only disbarment, which places a higher burden on respondent if he should seek readmittance, will properly protect the goals of the profession and require respondent to be totally candid to the reviewing tribunal before his readmittance will be considered. *See* comment to amended Pa.R.P.C. 8.1 ("The duty imposed by this Rule extends to persons seeking admission to the bar as well as to lawyers. Hence, if a person makes a material false statement in connection with an application for admission, it may be the basis for subsequent disciplinary action if the person is admitted. . . .").

Respondent lied to the Board of Law Examiners to bypass a proper evaluation of his character and fitness because he felt the truth might have barred him from sitting for the bar exam. The Board of Law Examiners is an essential gatekeeper that screens applicants seeking admission to the bar, and if respondent were sanctioned only with a suspension, it would accomplish an end-run around this essential inquiry.

 Taking into consideration respondent's diagnosed mental infirmities at the time of his almost two decades of misconduct, this Court finds respondent's transgressions require disbarment in order to safeguard the integrity of the profession and protect the interests of the public.[2] According-

---

**2.** The Office of Disciplinary Counsel did not seek revocation of respondent's license to practice law. The Disciplinary Board, however, has recommended this Court not only disbar respondent, but immediately revoke his license to practice law; this would require respondent to reapply for the bar examination, pass the Board of Law Examiners' character and fitness evaluation, and pass the bar examination before being eligible to seek reinstatement following his five-year disbarment. *See* Pa.R.D.E. 218(b) (disbarred attorney must wait at least five years to apply for reinstatement). This way, the Board argues, respondent will not get the benefit of bypassing the Law Examiners if successful on reinstatement.

Revocation of respondent's license has some allure, but there appears no direct support for such discipline in the Rules of Disciplinary Enforcement. *See* Pa.R.D.E. 204 (types of discipline available). However, this Court undoubtedly has the inherent power to revoke a license granted in the first place under this Court's rules and authority. That said, respondent's sins were not such as involved knowledge or legal abilities—they were sins of character and truthfulness. These qualities may be examined as part of any request for reinstatement, and there

ly, respondent is disbarred from practicing law in the courts of Pennsylvania; respondent shall comply with the provisions of Pa.R.D.E. 217, and shall pay the costs of these proceedings pursuant to Pa.R.D.E. 208(g).

Chief Justice CAPPY and Justices NIGRO and SAYLOR join the opinion.

Justice NEWMAN files a concurring and dissenting opinion in which Justices CASTILLE and BAER join.

## CONCURRING AND DISSENTING OPINION

Justice NEWMAN.

I agree with the Majority that this Court should order the disbarment of Respondent. I further agree with the reasoning of the Majority in support of this decision. However, I respectfully dissent from the portion of the Opinion that declines to follow the recommendation of the Disciplinary Board to revoke the license of Respondent to practice law.

It is within the inherent and exclusive power of this Court to govern the conduct of attorneys. *Commonwealth v. Stern,* 549 Pa. 505, 701 A.2d 568 (1997); *Wajert v. State Ethics Comm'n,* 491 Pa. 255, 420 A.2d 439 (1980). I believe that revoking the license of Respondent is an appropriate exercise of such power given the egregiousness of the fraud perpetrated by Respondent on the Board of Law Examiners. The Disciplinary Board made the following relevant findings of fact:

3. On April 9, 1995, Respondent signed and subsequently submitted to the Pennsylvania Board of Law Examiners an Application for Admission to the Bar of the Commonwealth of Pennsylvania, therein applying to sit for the July 1995 bar examination.

appears little to be gained in making him sit for a test on non-character matters. As this sanction was not sought by Office of Disciplinary Counsel, we decline to impose it at this juncture. While respondent concealed his deceit from the Board of Law Examiners initially, he will have to fully disclose and answer for all dishonesty and character issues should he seek reinstatement following disbarment.

4. Respondent executed a verification to the statements in the Bar Application as follows: "I verify that the statements of facts made by me in this application are true and correct and that they are made subject to the penalties of 18 Pa.C.S. § 4904 relating to unsworn falsification to authorities. I further verify that I have not omitted any facts or matters pertinent to this application."

5. In response to various questions in the Bar Application, Respondent made materially false and misleading statements and intentionally omitted material information.

6. Respondent attended Brown University School of Medicine from 1974 to 1977 and was conferred a Degree in Medicine on June 6, 1977.

7. Respondent completed a medical residency in internal medicine in 1978 at Thomas Jefferson University in Philadelphia.

8. On November 3, 1978, the New York State Education Department authorized Respondent to engage in the practice of medicine in the State of New York by issuing him a license.

9. Respondent completed a residency in ophthalmology surgery in 1981 at the State University of New York at Downstate Medical Center, Brooklyn, New York.

10 From 1981 to 1984, Respondent engaged in the private practice of medicine in New York City and served as Assistant Clinical Professor of Ophthalmology at New York Medical College, St. Vincent's Hospital and Medical Center and the New York Eye and Ear Infirmary.

11. Respondent resided in California on and after April 9, 1985 to in or about March 1992.

12. On August 13, 1984, the California Medical Board issued to Respondent a physician and surgeon certificate number.

13. Respondent was not certified by the American Board of Ophthalmology. He had taken the examination for Board certification but did not pass it.

14. On August 1, 1985, Respondent submitted an application for appointment to the medical staff of Verdugo Hills Hospital in Glendale, California, which falsely represented that he was certified by the American Board of Ophthalmology and included a false certificate in support of the misrepresentation. ·

15. On September 18, 1985, Respondent filed a similar false application and certificate in connection with an application for appointment to the medical staff of Glendale Adventist Medical Center in Glendale, California.

16. In or about October 1986, the Attorney General of the State of California commenced a disciplinary action against Respondent as a result of the false certificates referenced above. Respondent was charged with violating California Business and Professions Code § 2261, which provides that it is unprofessional conduct to knowingly make or sign any certificate or other document directly or indirectly related to the practice of medicine or which falsely represents the existence or non-existence of a state of facts.

17. On August 19, 1987 Respondent endorsed a Stipulation in Settlement admitting the allegations for the purposes of that proceeding and agreeing that his license would be revoked, with the revocation stayed for a period of five years and that he would be placed on probation with conditions.

18. By Statement of Charges dated July 11, 1988, New York State Department of Health, State Board of Professional Medical Conduct initiated a reciprocal discipline proceeding based on the stayed revocation and probation in California.

19. Although Respondent contested the imposition of reciprocal discipline, New York State found that Respondent's knowing conduct violated New York law and suspended Respondent's license to practice as a physician for five years, the execution of the last four years to be stayed, and Respondent be placed on probation with conditions.

20. In September 1991, the California Board filed against Respondent an Accusation and Petition to Revoke Proba-

tion, alleging that in 1987 and 1988, Respondent engaged in gross neglect in the treatment of six patients and knowingly made false documents in the nature of inaccurate surgical and treatment records.

21. On May 18, 1992, Respondent executed a Stipulation for Surrender of Certificate, wherein he agreed to surrender his license.

22. Thereafter New York State filed a Statement of Charges requesting reciprocal discipline based on the California proceeding.

23. In June 1993, New York State revoked Respondent's license to practice medicine in New York.

24. In August 1992, Respondent entered Temple University School of Law.

25. During law school, Respondent was employed by a law firm that handled a large number of medical malpractice cases. Respondent's resume at that time stated that he held medical licenses in California and New York. Respondent failed to disclose to the law firm that he had surrendered both medical licenses.

26. As found above, in April 1995, Respondent submitted an application to take the Pennsylvania bar examination. In response to Question 5 of the Application which requires the applicant to list all schools attended above high school including the dates of attendance, the degree received and the date conferred, Respondent omitted from his response his attendance at and degree received at Brown University School of Medicine, his attendance at Thomas Jefferson University, and his attendance at Downstate Medical Center in New York.

27. In response to Question 7 of the Bar Application relating to residences outside of Pennsylvania within the last ten years, Respondent answered that he resided at 1120 S. Dolton Ct., Wilmington, Delaware, from June 1984 to April 1995, when in fact he resided in California from 1985 to about March 1992.

40

28. In response to Question 13 of the Application which asks the applicant if he ever altered or falsified any official document or copy thereof referring to his professional qualifications, Respondent answered "No" when in fact he admitted to the Medical Board in California in 1987 that he had filed two applications that falsely represented he was "Board Certified" and included a false certificate in support of the misrepresentation.

29. Respondent failed to follow the directive following Questions 13–16 that requires an applicant who falsified any official document to send all related documentation along with the Bar Application. Respondent failed to send any documents relating to disciplinary actions in California and New York.

30. In response to Question 17 of the Bar Application which asks if the applicant has "ever, as a member of any profession or organization or the holder of any office or license, been the subject of any proceeding or inquiry which involved censure, removal, suspension, revocation of license, or discipline", Respondent omitted the disciplinary actions in California and New York.

31. In response to Question 18(a) of the Bar Application relating to applying for a permit or license that required proof of good character, Respondent omitted that he applied for medial licenses in California and New York and the dates of those applications.

32. In response to Question 20 of the Bar Application relating to relevant employment information during the last seven years, Respondent omitted his employment as a medical professional in California from April 9, 1988 to 1992, misrepresented that he had been employed by: Kennard Lab Associates, 28 Lawson Avenue, Claymont, Delaware 19703 as a Lab Director from September 1984 to January 1992, and fabricated the existence of Kennard Lab Associates, which was never licensed to do business in Delaware and never operated at the address provided.

Report and Recommendations of the Disciplinary Board, March 8, 2004 at 3–8.

In light of the falsehoods and material omissions that riddled Respondent's application to sit for the bar examination, it is patently obvious that the Board of Law Examiners did not have a full and fair opportunity to determine whether he should have been admitted as an attorney in the first instance. Simply to disbar Respondent without revoking his license rewards him for having lied successfully because a petition for reinstatement will not require him to submit a new application for admission to the Board of Law Examiners and take another bar examination. Only by requiring Respondent to begin the admissions process *ab initio* can we be assured that he has the requisite fitness and character to be a member of the bar.

Accordingly, while I agree with the Majority to disbar Respondent, I dissent from the portion of its Opinion that rejects the recommendation of the Disciplinary Board to revoke the license of Respondent.

Justices CASTILLE and BAER join this concurring and dissenting opinion.