**IN THE SUPREME COURT OF PENNSYLVANIA
WESTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, JJ.**

| | |
|---|---|
| OFFICE OF DISCIPLINARY COUNSEL, | No. 1813 Disciplinary Docket No. 3 |
| Petitioner | No. 6 DB 2012 |
| v. | Attorney Registration No. 65241 (Philadelphia) |
| BRIAN J. PRESKI, | ARGUED:  September 9, 2015 RESUBMITTED:  January 20, 2016 |
| Respondent | |

**<u>OPINION</u>**

**JUSTICE WECHT**                                                   **DECIDED: March 29, 2016**

This matter comes to us following the issuance of a Report and Recommendation by the Disciplinary Board of the Supreme Court of Pennsylvania ("Board").  From 2000 to 2007, Brian J. Preski served as the Chief of Staff to State Representative John Perzel, the Majority Leader (and later the Speaker) of the Pennsylvania House of Representatives.  During his tenure as a public servant, Preski conspired to misappropriate millions of dollars in public resources for his own personal and political gain.  In its report, the Board detailed its factual findings and recommended that Preski be disbarred.  Because the evidentiary record abundantly supports the Board's findings and recommendation, we disbar Preski from the practice of law in this Commonwealth.

For six years, in his capacity as a state official and in collusion with Perzel and others, Preski used state employees and public funds to develop sophisticated data

collection and processing software for partisan political campaigns. That conspiracy, which the media dubbed "computergate," had three discrete components. First, Preski and his cohorts misused public employees and resources to advance campaign efforts. Second, they used taxpayer funds to purchase campaign-related software, data, and services from outside technology vendors. Third, Preski and Perzel formed two consulting companies in an effort to profit personally from those taxpayer-financed technologies.

The conspiracy began in November 2000 when Perzel very narrowly won his bid for re-election. The slight victory prompted Perzel to explore emerging technologies that could improve his future campaigns. After the election, Perzel and Preski commissioned state employees from the Republican Information and Technology Office ("RIT") to develop a "Blue Card" system, a massive electronic database of voter demographics and attitudes obtained from door-to-door interviews. The system would group voters with similar preferences and predict how a particular citizen would cast his or her vote, if at all. Armed with this information, Perzel's campaign could target its messaging to specific voters and could ensure that key constituencies got to the polls on Election Day. For Perzel, having such a system in place for the 2002 election became a top priority.

Preski and his co-conspirators held meetings regarding the development of Blue Card during the workday at the Capitol in Harrisburg. The RIT dedicated significant employee hours, resources, and equipment to the creation of the database, all at taxpayers' expense. Indeed, this work became so commonplace that the assignments largely went unquestioned by RIT staff. The RIT was able to create a somewhat rudimentary application that served as proof of the Blue Card concept.

In addition to squandering equipment and the time and efforts of public servants, Preski and his colleagues also paid outside technology vendors directly from the public till. When Perzel sought to improve Blue Card by developing a backend "enterprise database" to aggregate and store data from multiple sources, he put Preski and Bill Tomaselli, another House employee and trusted political operative, in charge of the project. On January 1, 2002, Preski signed a $2,000,000 contract with GCR, Inc. ("GCR"), a Louisiana-based technology company, to develop the new database. Although that contract, by its terms, purported to be for legislative "reapportionment assistance," GCR's actual task was to create a system that would help Perzel and his colleagues win elections and retain their party's majority in the House. GCR exclusively received public funds in satisfaction of the January 1, 2002 contract.

After GCR completed the system, Preski signed subsequent high dollar contracts for GCR's ongoing services. For instance, GCR developed a campaign tool for the House Republican Caucus knows as The Edge in the months leading up to the 2002 election. That application, financed entirely by the Commonwealth's taxpayers, allowed users to generate a list of voters who fit certain criteria, and then predicted which of them would vote in the general election. Preski, who served as the manager of Perzel's 2002 re-election campaign, personally had access to The Edge. In October 2002, Preski forwarded a new GCR contract to the House Billing Clerk, and directed that GCR's monthly invoices, each in the amount of $200,000, be paid with funds from the RIT's "computer budget."[1]

Although still a work-in-progress, Blue Card was operational during the 2002 election. Perzel won his bid for re-election, and he considered Blue Card to be a

---

[1]     All told, GCR received $9,286,000 in public funds between 2001 and 2008.

success. Over the next several years, Preski oversaw a seemingly endless series of improvements to Blue Card along with the development of related software. For example, Perzel and Preski retained Aristotle International, Inc. ("Aristotle") to add new features and improvements to Blue Card. Preski and Perzel reviewed and approved every contract that the House Republican Caucus entered into with Aristotle. From 2003 to 2008, Aristotle received $6,200,000 in public funds, most of which was for campaign-related services. In 2004, Preski also personally approved a $50,000 payment to yet another vendor, Weiss Micromarketing Group ("Weiss"), which specializes in "segment data," *i.e.,* the classification of voters into "lifestyles" in order to better target direct mail, persuade undecided voters, and predict election results.

Perzel, Preski, and Tomaselli formed a political consulting company called Greystone in an effort to profit personally from the publicly funded technology and expertise that they had developed in conjunction with GCR. On the morning after the 2002 election, Tomaselli sent an email to Preski expressing his desire to continue working on Blue Card. Preski responded: "Consider it done. We need you to do it, Billy, because we proved [the] Greystone concept in multiple districts last night, and I'm sure you're aware it will make us millionaires." Disciplinary Hearing Transcript ("D.H.T."), 2/27/2014, at 218.

A few months later, Perzel sent Tomaselli to serve as the field coordinator for Sam Katz' Philadelphia mayoral campaign, where Tomaselli would review and approve consulting contracts for the campaign. GCR and Greystone submitted to the Katz campaign a joint proposal for campaign consulting services totaling $2,208,846. When Tomaselli told the president of GCR that he did not want to approve the proposal, Preski met with Tomaselli and pressured him, albeit cryptically, to approve the bid, reminding him that "sometimes you got to do some things you don't want to do, . . . friends are

friends." Report and Recommendations of the Disciplinary Board, 4/20/2015, at 11. GCR's president then called Tomaselli and told him that he had been given his "marching orders" and would need to approve the GCR/Greystone proposal. Tomaselli ignored this directive.[2]

In July 2010, following a grand jury investigation, the Pennsylvania Attorney General charged Preski with twelve counts each of theft by unlawful taking or disposition, theft of services, theft by deception, theft by failure to make required disposition of funds received, criminal conspiracy, and conflict of interest.[3] Preski proceeded to a jury trial, which commenced on September 28, 2011. On October 5, 2011, the fourth day of his trial, Preski pleaded guilty to three counts of conflict of interest, two counts of theft of services, and five counts of criminal conspiracy. The trial court sentenced Preski to twenty-four to forty-eight months' imprisonment and imposed a consecutive five-year term of probation, a $37,500 fine, and $1,000,000 in restitution.

Following Preski's guilty plea and sentencing, this Court entered an order placing Preski on temporary suspension pursuant to Pa.R.D.E. 214(f)(1), and referring the matter to the Board for further proceedings. A Hearing Committee assigned by the Board held disciplinary hearings on January 30, 2014, February 27, 2014, and March 13, 2014. At those hearings, the Office of Disciplinary Counsel ("ODC") entered into evidence Preski's indictment, the testimony from his criminal trial, and numerous news articles discussing Preski's conduct, trial, and conviction. Preski presented eight character witnesses, numerous character reference letters, his sentencing

---

[2] Perzel and Preski, without Tomaselli, later formed another political consulting company called SKP. With the exception of a single $10,000 consulting fee from a local political campaign, SKP proved to be as fruitless as Greystone.

[3] 18 Pa.C.S. §§ 3921(a), 3926(a)(1), 3922(a)(1), 3927, 903, and 65 Pa.C.S. § 1103(a), respectively.

memorandum, his resume, and his personal calendars from the years that his criminal activity occurred. Preski also testified on his own behalf.

The Hearing Committee concluded that Preski violated Rule of Professional Conduct 8.4(b), which states that it is professional misconduct for a lawyer to commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects. The committee also concluded that Preski was subject to discipline pursuant to Pennsylvania Rule of Disciplinary Enforcement 203(b)(1), which provides that a criminal conviction shall be grounds for discipline.

The committee found nine aggravating factors and two mitigating factors in this case. The nine aggravating circumstances that the Hearing Committee noted were that Preski acted in concert with Perzel to plan, direct, and control a "corrupt swindle of the taxpayers"; Preski directed staff members under his supervision to participate in the conspiracy; Preski attempted to use the technology that he purchased with stolen taxpayer funds for his own personal pecuniary gain; Preski held a highly visible position of public trust; Preski failed to take full responsibility for his crimes; Preski's attempts to convince the Hearing Committee that Perzel forced and/or bullied him into committing the crimes were incredible; Preski brought disrepute upon the bar; Preski failed to withdraw from the conspiracy; and Preski did not take responsibility for the fact that he was a leader and instigator of the conspiracy. The two mitigating circumstances that the Hearing Committee considered were Preski's lack of disciplinary history and his significant contributions to the House of Representatives, and to the people of Pennsylvania, throughout his career.

Emphasizing the magnitude, duration, and cost of Preski's crimes, the Hearing Committee characterized this matter as "one of the most serious political corruption cases in our disciplinary jurisprudence," and recommended that Preski be disbarred.

Hearing Committee Report, 7/25/2014, at 34. Preski then filed a brief on exceptions and requested oral argument before the Board. Following argument, the Board recommended that Preski be disbarred, noting that the facts of this case were strikingly similar to those in ODC v. Foreman, 1543 DD 3 (Pa. 2014) (disbarring an attorney and former legislative aide who participated in a scheme to use public employees and funds for partisan political purposes).[4] Preski, believing that these circumstances do not warrant disbarment, filed a petition for review with this Court. This matter is now ripe for final disposition.

"In attorney discipline matters we exercise *de novo* review, and we are not bound by the findings and recommendations of the hearing committee or the Board, though we give them substantial deference." ODC v. Chung, 695 A.2d 405, 407 (Pa. 1997). The ODC bears the burden of establishing attorney misconduct by a preponderance of the evidence. ODC v. Cappuccio, 48 A.3d 1231, 1236 (Pa. 2012). Because discipline is imposed on a case-by-case basis, we must consider the totality of facts presented, including any aggravating or mitigating factors. Id. at 1238. Despite the fact-intensive nature of this endeavor, we strive for consistency so that similar misconduct "is not punished in radically different ways." ODC v. Lucarini, 472 A.2d 186, 190 (Pa. 1983).

It is well established that a criminal conviction itself is a basis for discipline. See Pa.R.D.E. 203(b)(1) (grounds for discipline); ODC v. Costigan, 584 A.2d 296, 300 (Pa. 1990). Thus, the issue in this case is not whether discipline is warranted, but whether we should impose disbarment, a sanction that is reserved for only the most egregious ethical violations, as the Board recommends. ODC v. Jackson, 637 A.2d 615, 619 (Pa.

---

[4] See also ODC v. Foreman, No. 164 DB 2009 (D. Bd. Rpt. May 19, 2014), available at http://www.pacourts.us/assets/opinions/DisciplinaryBoard/out/164DB2009-Foreman.pdf.

1994). In determining the appropriate measure of discipline, we remain cognizant that disciplinary sanctions are not designed for their punitive effects, but rather are intended to protect the public from unfit attorneys and to maintain the integrity of the legal system. ODC v. Christie, 639 A.2d 782, 785 (Pa. 1994).

We agree with the ODC that the pertinent facts of this case are nearly identical to those in Foreman, where we ordered disbarment rather than imposing a five-year suspension. In that case, Foreman was the Chief of Staff to the Minority Whip of the House Democratic Caucus. Foreman supervised numerous public employees and had the power to allocate public funds, employees, and resources. Foreman's scheme, which the media labeled "bonusgate," involved the use of Commonwealth resources for partisan political purposes. Much like Preski, Foreman "was a central participant in a concerted pattern of illegal conduct in which taxpayer dollars, equipment and other resources were misdirected to campaign efforts." Foreman, No. 164 DB 2009 at 10.

The Board in Foreman found six mitigating factors. Notwithstanding Foreman's central role in the bonusgate conspiracy, he assisted the Commonwealth in its investigation and prosecution. After pleading guilty to multiple felonies, Foreman testified against his former colleagues. Foreman also expressed sincere remorse for his crimes, took full responsibility for his actions, had no prior record of discipline, devoted significant time to volunteer activities, and presented evidence of his good character. Nevertheless, the Board recommended that Foreman be disbarred, concluding that this mitigating evidence could not overcome Foreman's fundamentally dishonest conduct, which illustrated a lack of integrity. We accepted the Board's recommendation and entered an order disbarring Foreman.

Instantly, the Board was guided by our order in Foreman, noting that the cases factually are similar, but that the mitigating evidence presented in Foreman was far

more compelling than the mitigating circumstances present in this case. The Board also considered the fact that, unlike Foreman, Preski failed to take full responsibility for his criminal conduct. According to the Board, Preski attempted to minimize his substantial role in the computergate conspiracy by suggesting that he was merely an inattentive supervisor. Specifically, Preski testified throughout the hearing that he was "willfully blind" and "not the watchdog [he] should have been." D.H.T., 2/27/2014, 50, 85. He also testified that he "turned a blind eye" and "didn't do anything to stop" his staff from misusing public resources. Id. at 84, 85, 165. Citing this testimony, the Board concluded that Preski "has not accepted responsibility for his misconduct and has not demonstrated recognition of the gravity of his acts." Report and Recommendations of the Disciplinary Board at 29.

Preski argues that Foreman is inapposite because the evidentiary record does not support the Board's conclusion that Preski failed to accept responsibility for his convictions.[5] He directs us to portions of the disciplinary hearing transcript where he conceded that he was "part and parcel" of the computergate conspiracy and took responsibility for his misconduct. Id. at 145-146, 196. Notwithstanding these passing declarations, the hearing transcript reveals that Preski repeatedly understated the breadth of that misconduct. See, e.g., id. at 83-84 ("I failed to do my job, to follow up with what was going on [in the RIT], and the best that I can say is that I knew that the people down there were at times doing campaign work."); 85 (stating that he "turned a blind eye," "became willfully blind," and "did nothing to stop" the misuse of public

---

[5]    Preski also argues that, unlike in Foreman, the Board capriciously discredited the testimony of his character witnesses. We need not discuss this contention at length because it is clear that the Board did no such thing. See Report and Recommendations of the Disciplinary Board at 30 ("Eight witnesses from [Preski's] professional and community life testified. Each witness was credible and truthful.").

resources); 87 ("I was given a great job as a supervisor of a lot of people, and I relied on them to do their jobs and to do it properly."); 89 ("I never checked to make sure that [Aristotle was] getting paid from the campaign to create those programs."); 91 ("It was my job to supervise Tomaselli as he went forward with the [Weiss] project. I failed.").

Preski also misrepresented his role in Greystone. He testified that Greystone was only a vehicle for his wife to serve as a paid campaign consultant, and characterized it as "her thing." Id. at 64. This was incorrect. In his criminal case, Preski pleaded guilty to, *inter alia*, "attempting to use [] public resources for specific personal pecuniary gain in setting up a corporation called Greystone and attempting to profit from public resources through that corporation." Guilty Plea Transcript, 10/5/2011, 10. Preski predicted that Greystone would make him and Tomaselli "millionaires." He also pressured Tomaselli, in his capacity as field coordinator for the Katz mayoral campaign, to approve a seven-figure proposal that included Greystone's services.

Preski's attempt to distinguish this case from <u>Foreman</u> by challenging the Board's finding that he failed to accept responsibility for his convictions is unpersuasive. The record before us plainly illustrates Preski's lack of candor before the hearing committee. Moreover, even if Preski had accepted complete responsibility for his crimes, disbarment still would be warranted. <u>See Foreman</u>, *supra* (disbarring attorney despite his expression of "sincere remorse" and his acceptance of responsibility for his crimes).

Finally, Preski disputes the Board's determination that his misconduct caused disrepute to the bar. The Board noted that Preski's crimes "were widely reported throughout the Commonwealth" and that this publicity "was particularly damaging because it became an integral part of a media narrative that described pervasive corruption among politicians in the Pennsylvania Legislature." Report and

Recommendations of the Disciplinary Board at 28. Preski emphasizes that none of the media reports that the Board relied upon (including some that explicitly identified Preski as a "Philadelphia lawyer") "purport[ed] to associate Preski's misconduct or his convictions with his status as a lawyer. To the contrary," Preski argues, "the articles consistently portray[ed] Preski as a secondary player whose involvement was based on his status as Perzel's top aid[e] or Chief of Staff." Brief for Preski at 36-37. In short, Preski evidently believes that only conduct associated with one's "status as a lawyer" is capable of tarnishing the reputation of the bar. This, too, is incorrect.

Preski was a highly visible figure in law and government. His status as a member of the bar was no secret. Before he was hired as Perzel's chief of staff, Preski was an Assistant District Attorney in Philadelphia. In the House of Representatives, Preski held a prominent position of public trust. He supervised over 900 state employees, including attorneys, research analysts, and support staff. He wielded significant control over an annual state budget of more than $26 billion, and he routinely met with the Governor, with state and local elected officials, and with United States Senators. He served on several boards of directors and was the Vice Chair of this Court's Criminal Procedural Rules Committee. To suggest that his misconduct does not speak to the integrity of the profession is to defy logic and common sense.

Preski's fraud against the public at large is no less reprehensible than a practitioner's theft of client funds. If anything, the transgressions of a lawyer who is also a public servant are even more injurious to the reputation of the bar because they bring dishonor both to the profession and to our democratic institutions. Public trust is an indispensable prerequisite to the effective administration of government. When a public official violates that trust, he or she undermines the integrity of the entire system. Considering the unprecedented scope, duration, and cost of Preski's criminal conduct,

any sanction short of disbarment here would necessarily suggest that disbarment is virtually never warranted in cases of public corruption. This we decline to do. "[S]ome conduct is simply too egregious and requires disbarment to protect the integrity of the profession and judicial tribunals." ODC v. Czmus, 889 A.2d 1197, 1203-04 (Pa. 2005).

We order that Preski be disbarred from the practice of law in this Commonwealth, retroactive to April 25, 2012. Preski shall comply with the provisions of Pa.R.D.E. 217, and pay costs to the Board pursuant to Pa.R.D.E. 208(g).

Justices Baer, Todd and Donohue join the opinion.

Justice Dougherty concurs in the result.

Chief Justice Saylor dissents, as he favors imposition of a five-year suspension.