911 A.2d 920

**OFFICE OF DISCIPLINARY COUNSEL, Petitioner,**

v.

**Sebastian M. RAINONE, Respondent.**

**No. 1164, Disciplinary Docket No. 3.**

Supreme Court of Pennsylvania.

Argued Dec. 5, 2006.

Decided Dec. 21, 2006.

Harriet R. Brumberg, Esq., Disciplinary Board of the Supreme Court of PA, Philadelphia, for Office of Disciplinary Counsel.

Larry M. Keller, Esq., Sidkoff, Pincus & Green, P.C., Philadelphia, for Sebastian M. Rainone.

BEFORE: CAPPY, C.J., and CASTILLE, SAYLOR, EAKIN, BAER and BALDWIN, JJ.

## ORDER

PER CURIAM.

Following oral argument, the Court adopts the findings of fact, conclusions of law and the reasoning set forth in the attached Report and Recommendation of the Disciplinary Board dated May 11, 2006.

We hereby ORDER that Sebastian M. Rainone be and he is disbarred from the Bar of this Commonwealth and he shall comply with all the provisions of Rule 217, Pa.R.D.E. It is further ORDERED that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.

Justice NEWMAN did not participate in the consideration or decision of this case.

## REPORT AND RECOMMENDATIONS OF THE DISCIPLINARY BOARD OF THE SUPREME COURT OF PENNSYLVANIA

TO THE HONORABLE CHIEF JUSTICE AND JUSTICES OF THE SUPREME COURT OF PENNSYLVANIA:

Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania ("Board") herewith submits its findings and recommendations to your Honorable Court with respect to the above-captioned Petition for Discipline.

### I. *HISTORY OF PROCEEDINGS*

On April 12, 2004, Office of Disciplinary Counsel filed a Petition for Discipline against Sebastian M. Rainone, Respondent. The Petition charged Respondent with professional misconduct in five client matters and one matter involving Respondent's attorney registration form. Respondent filed an Answer to Petition for Discipline on May 7, 2004.

A pre-hearing conference was held on July 7, 2004. This conference was attended by Petitioner, Respondent and his counsel, Samuel C. Stretton, Esquire. The parties informed the Chair of the Hearing Committee that they had executed a Stipulation which covered and admitted all of the charges. The disciplinary hearing was rescheduled for October 14, 2004, due to Mr. Stretton's trial schedule. Within days of that hearing, Respondent discharged Mr. Stretton and retained Christopher D. Mannix, Esquire. Respondent gave notice that he planned to withdraw his consent to the admission of the Stipulation.

The disciplinary hearing convened on November 15, 2004, before a District I Hearing Committee comprised of Chair Leigh M. Skipper, Esquire and Members Kelley A. Grady, Esquire, and Charles Eppolito, III, Esquire. Respondent was represented by Mr. Mannix. Argument was made on the admissibility of the Stipulation. Following the submission of briefs by the parties, the Hearing Committee issued an Order on January 26, 2005, admitting the Stipulation into evidence.

An additional hearing was held on February 2, 2005. The Stipulation was introduced by Petitioner. Respondent objected to the admission of the Stipulation. Respondent attempted to introduce an Amended Answer which had not been filed or previously submitted to the Committee. The Committee did not receive the Amended Answer as substantive evidence.

Following the close of the record the parties submitted briefs and the Hearing Committee filed a Report on May 31, 2005. The Committee found that Respondent engaged in professional misconduct and recommended that he be disbarred.

Respondent filed a Brief on Exceptions on June 28, 2005 and requested oral argument before the Disciplinary Board.

Petitioner filed a Brief Opposing Exceptions on July 28, 2005.

Oral argument was held on August 25, 2005 before a three member panel of the Disciplinary Board chaired by Louis N. Teti, Esquire, with Marc S. Raspanti, Esquire, and Min S. Suh, Esquire.

The Disciplinary Board adjudicated this matter at the meeting on September 12, 2005. By Order of the Disciplinary Board dated September 21, 2005, the Board appointed John W. Morris, Esquire, as Special Master and remanded the matter to the Special Master to determine the validity of the Stipulation entered into by the parties.

A Special Master Hearing was held on October 27, 2005.

The Special Master filed a Report on January 3, 2006. He concluded that the Stipulation was validly executed and became binding on the parties; Respondent presented no valid grounds for withdrawing the Stipulation; the Hearing Committee properly admitted the Stipulation and correctly ruled that Respondent could not contradict the Stipulation; Respondent thereafter presented no valid grounds for withdrawing the Stipulation; Respondent's choice to present no mitigation evidence should result in a closing of the record. The Special

Master recommended that the record be submitted to the Board for adjudication.

This matter was adjudicated by the Board at the meeting on February 1, 2006.

## II. *FINDINGS OF FACT*

The Board makes the following findings of fact:

The following Findings of the Special Master are incorporated herein:

1. Respondent knowingly and intelligently executed a Stipulation on July 7, 2004, in which he admitted the violations charged in the Petition for Discipline.

2. At the pre-hearing conference held on July 7, 2004, counsel for Petitioner and for Respondent, in Respondent's presence, notified the Chair of the execution of the Stipulation and of that fact that all of the offenses were being admitted.

3. Shortly before the scheduled disciplinary hearing, Respondent discharged his attorney and engaged a new attorney who notified Office of Disciplinary Counsel and the Chair of the Hearing Committee of his intent to withdraw the Stipulation.

4. Petitioner objected to the attempt to withdraw the Stipulation.

5. Petitioner would not have suffered actual prejudice from a withdrawal of the Stipulation and could have presented its case through witnesses and exhibits.

6. After considering evidence presented by the parties, arguments, and briefs, the Hearing Committee ruled on January 27, 2005, that the Stipulation would be admitted into evidence.

7. On February 2, 2005, the Hearing Committee found that violations had been committed as to all of the charges against Respondent. The Hearing Committee announced that it would begin the discipline stage of the proceedings.

8. Respondent, despite repeated invitation by the Hearing Committee, declined to present evidence in mitigation of punishment.

9. Respondent's decision to offer no mitigation evidence was knowing and intelligent and remains unchanged.

The following Joint Stipulations are incorporated herein:

1. Petitioner, whose principal office is located at Suite 1400, 200 North Third Street, Harrisburg, Pennsylvania, is invested pursuant to Rule 207 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of said Rules of Disciplinary Enforcement.

2. Respondent, Sebastian M. Rainone, was admitted to practice law in the Commonwealth in 1972. He maintains an office for the practice of law at 200 Bar Harbor Drive, Suite 400, West Conshohocken PA 19428. Respondent is subject to the jurisdiction of the Disciplinary Board of the Supreme Court of Pennsylvania.

3. Respondent has no prior history of discipline.

4. Respondent has a Master's Degree in Taxation and is a full-time professor in the business school at Villanova University in the M.B.A. program.

### Charge I—DeVuono Hunter Matter

5. On June 19, 1998, DeVuono Hunter retained Respondent to represent him in pursuing an EEOC complaint against the United States Postal Service.

6. By letter dated June 19, 1998, Respondent's agent advised Mr. Hunter of the terms of representation, including:

a. Respondent would charge an hourly fee of $150.00, to be billed in fractions of 1/10 hour;

b. Mr. Hunter was to pay costs;

c. Mr. Hunter was to pay a retainer of $1,500, to be paid in installments by June 29, 2000; and,

d. Respondent would bill monthly and expected current payments.

7. Respondent advised Mr. Hunter that if he prevailed in his case, then Respondent would seek payment of his fee from the Postal Service and Mr. Hunter would be reimbursed for any fees he had paid to Respondent.

8. Thereafter, Respondent billed Mr. Hunter from time to time, by bills reflecting the activity and the time spent on each activity.

9. Mr. Hunter paid Respondent by checks, as follows:

| CHECK DATE | AMOUNT |
|---|---|
| 6/22/98 | $ 750 |
| 7/02/98 | $ 750 |
| 7/23/98 | $ 930 |
| 8/03/98 | $ 500 |
| 9/10/98 | $ 500 |
| 10/06/98 | $· 467.50 |
| 11/19/98 | $ 500 |
| 12/13/98 | $ 640 |
| 2/02/99 | $ 500 |
| 4/02/99 | $ 500 |
| 7/02/99 | $ 750 |
| 8/__/99 | $ 500 |
| 2/04/00 | $ 1,837.10 |
| 8/21/00 | $ 3,000 |
| TOTAL | $12,124.60 |

10. By Decision dated July 7, 2000, the EEOC ruled in Mr. Hunter's favor, and awarded, inter alia, attorney's fees, directing a verified statement of fees to be submitted by Mr. Hunter's attorney to be paid by the Postal Service.

11. In July 2000, Respondent submitted to the Postal Service an Affidavit for Reasonable Attorney's Fees, with a breakdown of fees and costs of $34,248.80.

12. Respondent documented his attorney fees by attaching to his affidavit a series of "invoices" ostensibly addressed to Mr. Hunter.

13. He described these attachments to the Postal Service as invoices.

14. These "invoices" differ from the invoices he sent to Mr. Hunter and which Mr. Hunter paid.

15. The "invoices" submitted to the Postal Service carry a higher billable rate for Respondent's time than Respondent charged Mr. Hunter, and reflected more hours than Respondent charged Mr. Hunter for performing work on his case.

16. The "invoices" submitted to the Postal Service showed Respondent's hourly rate as $275.00, with a total of 124.25 hours, commencing June 19, 1998.

17. Respondent and the Postal Service negotiated his fee petition, agreeing to a compromise of $27,000, and the Postal Service issued a check in that amount to Respondent on December 26, 2000.

18. Of that money, $12,124.60 constituted client funds.

19. Respondent did not tell Mr. Hunter about Respondent's receipt of funds in which Mr. Hunter had an interest.

20. Respondent failed to remit to Mr. Hunter the fees that Mr. Hunter had paid.

21. Respondent failed to hold Mr. Hunter's funds intact in a segregated escrow account, and instead placed them into his operating account.

22. From time to time, commencing in January 2001, Mr. Hunter called Respondent to ascertain the status of the fee payment.

23. In a conversation on January 16, 2001, Respondent advised Mr. Hunter that Respondent had not received his fee from the Postal Service, and that if Mr. Hunter would accept $7,000, instead of $13,000, then the Postal Service might send the funds sooner.

24. Mr. Hunter informed Respondent that he was unwilling to accept only $7,000 and that he would wait for the full refund.

25. Thereafter, Mr. Hunter called Respondent on several occasions, and at least once a month.

26. When Mr. Hunter was able to reach Respondent on several occasions, Respondent told him that he had not yet received payment.

27. By letter from the Postal Service dated September 27, 2001, Mr. Hunter first learned that Respondent had received $27,000 from the Postal Service in December 2000.

28. Upon receipt of the letter from the Postal Service, Mr. Hunter contacted Respondent about this information.

29. Respondent told Mr. Hunter that:

a. Respondent was a poor record keeper;

b. Respondent had received the funds but had not properly credited Mr. Hunter;

c. Respondent was not in the position to refund the money at this time; and,

d. Respondent would pay Mr. Hunter his money.

30. Respondent failed to promptly pay Mr. Hunter the funds due.

31. By certified letters dated December 27, 2001 and January 7, 2002, Mr. Hunter asked Respondent to remit the funds due.

32. Respondent failed to promptly respond to those letters and to remit the funds.

33. Mr. Hunter filed a complaint against Respondent with the Philadelphia Bar Association's Fee Dispute Committee.

34. In March 2002, Mr. Hunter and Respondent submitted the matter to the Fee Dispute Committee.

35. As a result of the mediation, Respondent agreed to pay Mr. Hunter $12,000, plus interest, by May 3, 2002.

36. Respondent paid Mr. Hunter $3,000 by check dated May 10, 2002.

37. By check dated July 18, 2002, Respondent paid Mr. Hunter the remaining $10,000, which satisfied the debt.

38.   Respondent knew that his statements to Mr. Hunter were false when he told Mr. Hunter that the funds had not arrived from the Postal Service.

### CHARGE II—*Susan Mullen Matter*

39.   In 1994 or 1995, Susan Mullen consulted with Marc Pachtman, Esquire, about handling her employment discrimination case.

40.   Mr. Pachtman referred Ms. Mullen's case to Respondent.

41.   Respondent had an ongoing relationship with Mr. Pachtman, in which Respondent would pay Mr. Pachtman a referral fee of 1/3 of the attorney fee at the time of settlement.

42.   On March 6, 1995, Respondent filed a civil complaint on behalf of Susan Mullen against Gregory Oldsmobile in the Court of Common Pleas of Delaware County.

43.   On March 3, 1997, following a non-jury trial, the court found in favor of Susan Mullen and against Gregory Oldsmobile in the amount of $98,425.

44.   From time to time, Mr. Pachtman would call Respondent about the settlement funds, and Respondent would tell Mr. Pachtman that he did not have them.

45.   On August 28, 1998, Respondent settled the case against Gregory Oldsmobile for $68,000.

46.   At the time of settlement, Respondent received $68,000, which included his fee of $21,646.07.

47.   Respondent failed to inform Mr. Pachtman that Respondent had received $21,646.07 as his fee.

48.   After Respondent received the settlement funds, Respondent's representations to Mr. Pachtman that he could not collect his fee were false and he knew them to be false when he made them.

49.   Respondent failed to pay Mr. Pachtman his referral fee of $7,215.35.

50. Respondent failed to deposit or maintain Mr. Pachtman's referral fee in an escrow account.

51. Respondent deposited the fee proceeds into his operating account, thereby commingling Mr. Pachtman's funds with his own funds.

52. Respondent took Mr. Pachtman's referral fee and converted the funds to his own use.

53. In January 2001, Mr. Pachtman discovered that Respondent had collected his fee of $21,646 from Gregory Oldsmobile and confronted Respondent.

54. By letter dated February 13, 2001, Respondent wrote to Mr. Pachtman and confirmed that he would pay him a $7,215.35 referral fee.

55. By letter to Respondent dated April 14, 2001, Mr. Pachtman wrote that he had not received his referral fee, and if he did not receive it by the end of April, he would file a civil suit and a Disciplinary Board complaint against Respondent.

56. By letter dated May 31, 2001, from Respondent to Mr. Pachtman, Respondent enclosed a check for $2,000 and stated his intent to make final payment in no later than 60 days.

57. Respondent paid Mr. Pachtman the balance of his referral fee, from his attorney operating account, as follows:

   a. $2,000 on September 7, 2001

   b. $3,215.35 on December 21, 2001.

### CHARGE III—Allen Starr Matter

58. Allen Starr retained Respondent to represent him in a case against Creative Furniture Industries.

59. On May 15, 2001, Respondent received a $8,476.05 check from Creative Furniture Industries made payable to Allen Starr.

60. On May 15, 2001, Respondent deposited the check into his attorney operating account, thereby commingling Mr. Starr's funds with his own funds.

61. Respondent failed to deposit Mr. Starr's funds in a separate escrow account.

62. Respondent was required to hold inviolate not less than $4,658.53 on behalf of Allen Starr.

63. On May 18, 2001, Respondent wrote check number 2582, in the amount of $4,658.53, payable to Allen Starr, from his attorney operating account.

64. On Respondent's check register, he noted that this was "Final Settlement".

65. On May 29, 2001, Mr. Starr presented check number 2582 to PNC Bank.

66. On May 30, 2001, PNC Bank returned check number 2582 for insufficient funds.

67. Between May 18, 2001 and May 29, 2001, Respondent converted Mr. Starr's funds to his own use, making ATM withdrawals and writing personal checks from his operating account, including checks to Patricia S.M. Rainone, and for rent.

68. On June 6, 2001, Respondent wrote a check to Allen Starr for $4,658.53 from his attorney operating account.

69. Respondent wrote a notation on the check that it was a "reissue" of check number 2582.

*CHARGE IV—Diamond Furniture Matter*

70. Diamond Furniture, Inc., retained Respondent's services to bring a lawsuit against Logan Consumer Discount.

71. Respondent filed a civil complaint on behalf of his client in the Court of Common Pleas of Philadelphia County.

72. During the course of the representation, Respondent received fiduciary funds on behalf of his client.

73. On January 12, 2001, Respondent had a balance of $161 in his escrow account.

74. On January 24, 2001, Respondent wrote check number 1121 for $3,000, from his escrow account, made payable to Diamond Furniture.

75. On January 25, 2001, PNC Bank refused to negotiate check number 1121 due to insufficient funds.

76. Respondent failed to maintain sufficient funds in his escrow account to support all fiduciary entrustments.

77. On February 8, 2001, Respondent wrote check number 2427, for $3,000, to Diamond Furniture, from his attorney operating account.

78. Respondent wrote a notation on the check that it was a replacement for the IOLTA check.

79. Respondent failed to keep Diamond Furniture's fiduciary funds in an escrow account separate from his own property.

*CHARGE v.—Arthur Green Matter*

80. In April 2001, Arthur E. Green and Margo Green consulted with Respondent regarding representation in a fraudulent investment matter, where Mr. Green claimed to have lost $50,000 in Maryland.

81. Respondent advised Mr. Green that Respondent was familiar with the subject matter and experienced in the necessary litigation, recommended that he pursue claims through litigation, and agreed to take the case to trial if necessary.

82. Respondent was not a member of the Maryland bar.

83. By letter dated April 26, 2001, Respondent advised Mr. Green that a non-refundable retainer of $2,500 would be required for the representation, and that if a criminal prosecution resulting in Mr. Green's receipt of restitution occurred prior to the filing of a civil suit, then an additional $2,500 would be due.

84. On May 11, 2001, Mr. Green gave Respondent a check in the amount of $2,500, which he deposited into an account titled "Sebastian Rainone DBA Sebastian Rainone & Associates."

85. On October 25, 2001, Paul S. Lewis, Esquire, a Maryland attorney, filed a complaint in the Circuit Court for Montgomery County, Maryland, captioned *Arthur E. Green*

*and Margo Green v. Zvi Porath, Barbara Porath, and DTH Liss and Company Inc.*

86. On October 25, 2001, Mr. Lewis filed a Pro Hac Vice Motion on behalf of Respondent, in the Circuit Court for Montgomery County, Maryland.

The motion was denied.

87. On November 26, 2001, Mr. Lewis filed an Amended Motion for Respondent's admission.

88. By Order dated December 20, 2001, the Court directed that Respondent's appearance be entered on behalf of the plaintiffs.

89. On December 30, 2001, Mr. Green supplied Respondent with two boxes containing files in response to discovery requests relating to his case.

90. By Order dated January 3, 2002, the matter was referred to Alternative Dispute Resolution (ADR).

91. On January 16, 2002, the parties jointly requested a stay of the matter pending the ADR proceeding.

92. At a court hearing on January 17, 2002, an Order was entered noting that as a settlement was agreed upon but could not be formally concluded, the case was stayed, and the parties were ordered to submit a Joint Line of Dismissal with payment of costs.

93. On January 22, 2002, the court ordered that: the case be stayed for a period of thirty days; the parties were to file a Joint Line of Dismissal and filing fee within 30 days; and failure to file the Joint Line of Dismissal within 30 days would result in the case being dismissed without prejudice and without further order of the court.

94. On March 29, 2002, the case was dismissed pursuant to the January 22, 2002 Order.

95. On April 9, 2002, an ADR mediation took place, at which time:

    a. No resolution was reached; and,

28

b. Respondent told Mr. Green that the option of going to trial remained.

96. By facsimile dated May 20, 2002, Mr. Green advised Respondent that his case may have been misfiled and that Mr. Lewis told him to tell Respondent to file a Motion to Resubmit.

97. By facsimile dated May 28, 2002, Mr. Green reminded Respondent that Mr. Lewis said that Respondent should file the Motion to Resubmit.

98. By facsimile dated May 29, 2002, Mr. Green forwarded to Respondent a strategy document to review.

99. By e-mail to Respondent dated May 29, 2002, Mr. Green set forth his ideas about how to argue his case.

100. Between late May and early July 2002, Mr. Green called Respondent on several occasions, and Respondent repeatedly promised him that everything would be back on track before Mr. Green left the country in early July.

101. By facsimile and e-mail dated June 25, 2002, Mr. Green advised Respondent that he had been recommissioned and might go overseas as early as July 7 or 8 through Labor Day; that he wanted to discuss the matter, and that he needed to find out whether Respondent had filed the motion to resubmit.

102. By facsimile dated July 2, 2002, Mr. Green informed Respondent that he would be out of the country from July 12 to Labor Day, advised Respondent that he had tried to contact him on numerous occasions during the last month, and asked Respondent when he would be available to talk.

103. On July 8, 2002, Respondent and Mr. Green spoke regarding Mr. Green's lawsuit, and Respondent agreed to:

a. Get the case "back on track" immediately;

b. Coordinate with local counsel;

c. Proceed pursuant to the strategy discussed; and,

d. Keep in touch with Mr. Green.

104. By facsimile dated July 9, 2002, Mr. Green confirmed his conversation of July 8, 2002 with Respondent.

105. By facsimile from Doha, Qatar dated July 17, 2002, Mr. Green: complained Respondent never got back to him the previous week; reiterated that it was critical to get "back on track"; requested that Respondent keep him advised, and provided his work telephone number, fax number and e-mail address.

106. Respondent failed to respond to Mr. Green's fax and to communicate with Mr. Green.

107. Respondent failed to contact Mr. Lewis and request that he file a Motion to Resubmit on behalf of the Greens.

108. Respondent failed to take any action to have Mr. Green's lawsuit reinstated.

109. By letter dated September 26, 2002, Stephen A. Myrow, Esquire, a member of the D.C. Bar, wrote to Respondent on behalf of Mr. Green, set forth Mr. Green's concerns, demanded that Respondent refund the fee, and requested that Respondent surrender the file by October 15, 2002.

110.ʹ Respondent contacted Mr. Myrow and advised him that the file and fee would be returned promptly.

111. Respondent failed to promptly refund the fee.

112. By telephone call to Mr. Myrow on October 28, 2002, Respondent stated he would surrender the file on November 1, 2002, refund a portion of the fee with the file, and refund the balance at the end of 30 days.

113. In late October 2002, Respondent forwarded to Mr. Green a box containing legal papers.

## CHARGE VI—Legal Administration

114. On Respondent's 1999–2000 Annual Attorney Registration Statement, he failed to identify all accounts in which he held fiduciary funds; falsely certified that he was in compliance with RPC 1.15; and falsely certified that all information on the statement was true and correct.

115. On Respondent's 2001—2002 Annual Attorney Registration Statement, he failed to identify all accounts in which he held fiduciary funds; falsely certified that he was in compliance with RPC 1.15; and falsely certified that all information on his statement was true and correct.

116. On Respondent's 2002–2003 Annual Attorney Registration Statement, he failed to identify all accounts in which he held fiduciary funds; falsely certified that he was in compliance with RPC 1.15; and falsely certified that all information on his statement was true and correct.

117. Respondent failed to maintain accurate contemporaneous records for transactions involving fiduciary funds for a period of five years after termination of the representation.

### Mitigating Circumstances

118. Respondent introduced no evidence of mitigating circumstances surrounding the events giving rise to the charges.

119. Respondent did not testify about these events.

120. Because Respondent did not testify, the record shows no evidence of remorse or acceptance of responsibility.

121. The Hearing Committee encouraged Respondent to testify and/or to offer other mitigating evidence, but he chose not to do so.

122. At the pre-hearing conference, Respondent's original counsel indicated that he expected to offer "four or five witnesses ... a bookkeeper or an accountant, and maybe someone who at one point was in [Respondent's] office as to any changes assuming there are some." July 7, 2004 Transcript at 5. Additionally, his former counsel stated that he might offer a report of a clinical psychologist.

123. None of this evidence was offered.

## III. CONCLUSIONS OF LAW

By his conduct as set forth above, Respondent violated the following Rules of Professional Conduct:

1.  RPC 1.15(a)—A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property.

2.  RPC 1.15(b)—Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. A lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

3.  RPC 1.3—A lawyer shall act with reasonable diligence and promptness in representing the client.

4.  RPC 1.4(a)—A lawyer shall keep a client informed about the status of a matter and promptly comply with reasonable requests for information.

5.  RPC 1.4(b)—A lawyer shall explain a matter to the extent necessary to permit the client to make informed decisions regarding the representation.

6.  RPC 4.1(a)—In the course of representing a client, a lawyer shall not knowingly make a false statement of material fact or law to a third person.

7.  RPC 8.4(c)—It is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice.

## IV.  *DISCUSSION*

This matter comes before the Board on a convoluted procedural history, which has been set forth above. In an unusual occurrence, the Board appointed a Special Master to determine the validity of a Stipulation which had been entered into between the parties, and from which the Respondent attempted to withdraw. The Special Master issued a detailed and concise Report, finding that Respondent knowingly and intelligently executed a Stipulation on July 7, 2004, in which he admitted the violations charged in the Petition for Discipline.

The Master concluded that the Stipulation was validly executed and became binding on the parties, and that Respondent presented no valid grounds for withdrawing the Stipulation or impeaching the actions of the Hearing Committee. The Master made a final recommendation to the Board that the underlying record be submitted for adjudication. Having accepted the conclusions reached by the Special Master as sound, the purpose of this Board Report is not to revisit the Master's thorough work, but rather to adjudicate this matter based on the record before us, which includes the validly executed Stipulation.

This matter presents the case of an attorney with 35 years of practice and no prior history of discipline, who is charged with two serious incidents involving dishonesty with entrusted client funds, three episodes of mishandling funds, and a derivative technical violation relating to Respondent's annual attorney registration statements.

The two critical matters are the Hunter and Mullen situations. In Hunter, Respondent represented his client in an EEOC action and received fees from his client at an agreed hourly rate in a total amount of $12,124.60. Respondent explained to his client that if they were successful in the case, counsel fees would be awarded and Mr. Hunter would be reimbursed the amount which he paid to Respondent. After successfully concluding the matter, Respondent applied for an award of counsel fees from the defendant, eventually compromised the claim, and received an agreed amount of $27,000 on December 20, 2000.

Respondent did not inform his client that he had received the money. Over the next nine months, he repeatedly misrepresented that he had not received any award, and further suggested that the recovery could be expedited if Mr. Hunter would accept $7,000 instead of the full amount of $12,000. In September 2001, Mr. Hunter learned from the defendant that Respondent had in fact been paid. Mr. Hunter then confronted Respondent, who admitted receipt of the funds and promised to pay over the amount due. Respondent did not promptly pay the $12,124.60. He ignored letters from his client

concerning the matter. Mr. Hunter eventually took the matter to the Fee Dispute Committee, where Respondent agreed to make payment of $12,000, plus interest, by May 3, 2002. In fact, Respondent paid $3,000 on May 10, 2002 and the remainder on July 18, 2002.

The Mullen matter was referred to Respondent by Marc Pachtman, Esquire. It was ultimately settled for $68,000, which was paid on August 28, 1998. Although Respondent had an ongoing understanding that he would pay a one-third referral fee on cases referred by Mr. Pachtman, he neither paid Mr. Pachtman the referral fee nor informed him that he had received the settlement proceeds. Respondent repeatedly misrepresented that he had not received the settlement funds. Mr. Pachtman eventually discovered the truth in January of 2001, confronted Respondent and received Respondent's promise to pay the referral fee of $7,215.35. In a series of payments, beginning May 31, 2001, and ending December 21, 2001, Respondent eventually paid the agreed amount.

The Starr and Diamond Furniture matters involve Respondent's mishandling of client funds, wherein he bounced a check and within one month successfully paid the amount due. The Green matter is an attorney neglect case punctuated by an unfulfilled promise to make a fee refund. The matter involving "legal administration" is based on the fact that Respondent's attorney registration statements for several years were inaccurate due to his mishandling of client funds.

The Board is charged with recommending the appropriate sanction to be imposed on Respondent in light of his professional misconduct. There is no per se rule for discipline in cases involving the mishandling of client funds. *Office of Disciplinary Counsel v. Lucarini*, 504 Pa. 271, 472 A.2d 186 (1983). A review of cases indicates that the discipline to be imposed for charges such as these is very fact-specific. Aggravating and mitigating factors should be considered. *In re Anonymous No. 35 D.B. 88*, 8 Pa. D. & C.4th 344 (1990).

Because of the wide variety of fact patterns involving commingling, conversion of funds, misrepresentation, and lack of

candor and diligence in handling a client's case, sanctions have ranged from short suspensions with practice or sobriety monitors to disbarment, the most severe penalty. *Office of Disciplinary Counsel v. Karen G. Muir*, 577 Pa. 536, 847 A.2d 660 (2004) (three month suspension); *Office of Disciplinary Counsel v. John T. Olshock*, 576 Pa. 213, 839 A.2d 175 (2003) (three year suspension); *Office of Disciplinary Counsel v. Daniel Evans*, 572 Pa. 571, 817 A.2d 1081 (2003) (disbarment); *Office of Disciplinary Counsel v. Patricia Renfroe*, 584 Pa. 544, 886 A.2d 664 (2005) (disbarment). The misconduct engaged in by Respondent is very serious. He lied repeatedly to his client, Mr. Hunter, regarding the receipt of fees. He deposited the full check into his own operating account. Even after being confronted by Mr. Hunter, Respondent did not cooperate and turn over Mr Hunter's fees. Instead, Mr. Hunter was forced to take Respondent to fee dispute mediation. Compounding Respondent's bad behavior was his continued failure, even at that juncture in time, to promptly pay the agreed upon settlement. Similar conduct occurred in the Mullen matter with the referral fee. Combined with the other instances of commingling and neglect, Respondent must face serious discipline.

The only mitigating factor present in this matter is Respondent's unblemished record of discipline during his 35 years of law practice. Respondent's background makes the current misconduct all the more astonishing in its gravity. Respondent chose not to put forth on the record any explanation of his actions or other mitigating factors.

Respondent's misconduct raises questions about his fitness to practice law in an ethical manner. There is no evidence of record that he has taken remedial actions in his law practice to ensure that client funds are handled properly. There is no evidence of record that Respondent understands his misconduct and feels any regret for his actions. There is no evidence of record that Respondent can assure this Board, and the Court, that the misconduct will not occur in the future. In short, based on the record presented to the Board, we are persuaded that disbarment is the appropriate sanction.

## V.  *RECOMMENDATION*

The Disciplinary Board of the Supreme Court of Pennsylvania unanimously recommends that the Respondent, Sebastian M. Rainone, be disbarred from the practice of law.

It is further recommended that the expenses incurred in the investigation and prosecution of this matter are to be paid by the Respondent.

Respectfully submitted,

THE DISCIPLINARY BOARD OF THE SUPREME COURT OF PENNSYLVANIA

By: _____
Louis N. Teti, Board Member