161 A.3d 800

OFFICE OF DISCIPLINARY COUNSEL, Petitioner

v.

Peter James QUIGLEY, Respondent

No. 30 DB 2015
No. 2262 Disciplinary Docket No. 3
Attorney Registration No. 37440 (Monroe)

Supreme Court of Pennsylvania.

ARGUED: December 6, 2016

DECIDED: June 20, 2017

Paul J. Killion, Esq., Kristin Ann Wells, Esq., Disciplinary Board of the Supreme Court of PA, for Office of Disciplinary Counsel, Petitioner.

Thomas P. Sundmaker, Esq., Law Offices of Thomas P. Sundmaker, for Quigley, Peter James, Respondent.

SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.

## OPINION

JUSTICE MUNDY

Respondent, Peter James Quigley, has filed exceptions to the Report and Recommendation by the Disciplinary Board of the Supreme Court of Pennsylvania (the Board) recommending his disbarment. For the reasons that follow, we adopt the recommendation of the Board and order Respondent's disbarment.

On February 20, 2015, the Office of Disciplinary Counsel (ODC) filed a petition for discipline alleging Quigley violated the Rules of Professional Conduct by mishandling the funds of five clients. On July 9, 2015, a three-member Hearing Committee held a disciplinary hearing, prior to which the parties jointly stipulated to the following facts regarding the five matters.

Harold Woodling, a friend of Quigley for whom he had done legal work in the past, retained Quigley to handle the administration of his wife's estate and a wrongful death claim following her death in July 2012. Woodling and Quigley agreed that Quigley's fee would be one-third of any gross recovery from the insurance claims. Quigley settled five insurance claims totaling $557,705.00 and was therefore entitled to a fee of $185,901.66. The settlement funds were deposited in Quigley's

IOLTA account.[1] He made two payments to Woodling in 2012 totaling $133,500.00. Quigley withdrew funds in arbitrary amounts from August 2012 to July 2013. On January 2, 2013, Quigley obtained a cashier's check for $165,000.00 drawn from his IOLTA account in order to satisfy a lien by Attorney Mark Primrose, with whom Quigley shared ownership of an office building. After the withdrawal of $165,000.00, the IOLTA account held a balance of $148,998.01 despite the fact that Quigley had not yet disbursed the remaining $238,303.34 owed to Woodling. In April 2013, Quigley made payment to Woodling in the amount of $117,000.00. Following the initiation of disciplinary proceedings, Quigley paid the remaining settlement funds owed to Woodling. Quigley stipulated that his conduct in this matter violated Rule of Professional Conduct 1.3, which provides, "a lawyer shall act with reasonable diligence and promptness in representing a client," and Rule of Professional Conduct 1.15(e) which requires that a lawyer promptly deliver to the client or third party any funds which the client or third party is entitled to receive.

Debra Tirado retained Quigley to represent her in a personal injury claim following a slip-and-fall accident in January 2011. Tirado and Quigley agreed Quigley would receive one-third of any gross recovery. The trial court directed that the proceeds from the settlement should be distributed as follows: attorney's fees to Quigley in the amount of $28,750.00; $2,560.29 for case expenses; $7,107.00 to medical providers; $8,678.79 to satisfy a lien from the Department of Public Welfare (the Department); and $69,892.92 to Tirado. The Department agreed to accept a reduced sum of $6,509.09 to satisfy its lien. However, at the close of the business day on February 28, 2014, Quigley had not paid the Department, and his IOLTA account had a balance of $13.30. After notification of disciplinary proceedings against him, Quigley paid the

1. "An IOLTA Account is an income producing Trust Account from which funds may be withdrawn upon request as soon as permitted by law. Qualified Funds are to be held or deposited in an IOLTA account." R.P.C. 1.15(a)(5). A lawyer is required to hold all Rule 1.15 funds "separate from the lawyer's own property. Such property shall be identified and appropriately safeguarded." R.P.C. 1.15(b).

Department $6,509.09, satisfying the payment owed. The parties stipulated Quigley's conduct violated Rules of Professional Conduct 1.3 and 1.15(e).

Hilda Dozier retained Quigley to represent her in her personal injury claim following her August 2013 car accident. After Quigley settled the case and disbursed some of the settlement funds, he informed Dozier he would hold $10,000.00 in trust for possible medical liens that might arise. Independence Blue Cross determined that no money was owed in relation to any insurance lien. Quigley failed to disburse the $10,000.00 promptly, and his IOLTA account reflected a balance of $262.96 as of January 17, 2014. After disciplinary proceedings were initiated against Quigley, he wrote to Dozier and enclosed a cashier's check for the $10,000.00 owed to her. The parties stipulated that Quigley's conduct in this matter violated Rules of Professional Conduct 1.3, and 1.15(e). In addition, the parties stipulated that Quigley violated Rule of Professional Conduct 1.15(b), which provides, "[a] lawyer shall hold all Rule 1.15 Funds and property separate from the lawyer's own property. Such property shall be identified and appropriately safeguarded." The parties further stipulated to a violation of Rule 8.4(c), which states that it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

Quigley was retained by Heather Wallace to represent her in a personal injury claim and ultimately settled the claim for $10,000.00 in 2013. He deposited the settlement funds into his IOLTA account. The settlement was to be disbursed as follows: $3,000.00 to Heather Wallace, $3,666.67 to Quigley for attorney's fees, and $3,333.33 to a third-party company for a subrogation claim. Quigley failed to promptly disburse the funds, and his IOLTA account had a balance of $13.73 on February 13, 2014. He disbursed the funds due to Wallace and the third-party company following notification of the disciplinary charges. The parties stipulated that he violated Rules of Professional Conduct 1.3, 1.15(b), and 1.15(e) in the course of his representation in this matter.

Joanne Larocque retained Quigley to represent her in her personal injury action in August 2013, and they agreed Quigley would receive one-third of the settlement in attorney's fees. The case settled in May 2014 for $10,000.00, and Quigley received two $5,000.00 settlement checks. One check was made payable solely to Larocque, and Quigley forwarded her that check. The other check was made payable to both Quigley and Larocque. Quigley deposited the check into his IOLTA account, and withdrew $2,500.00 of the $3,333.33 in fees he was owed. Quigley sent a check to Larocque from his IOLTA account for $1,667.00, the remaining settlement amount to which she was entitled. However, when Larocque attempted to cash the check, there were insufficient funds in the IOLTA account.[2] Specifically, the account had a balance of $403.30. Prior to the initiation of disciplinary proceedings, Quigley provided Larocque with a personal check for $1,667.00. The parties stipulated that Quigley's behavior constituted a violation of Rule of Professional Conduct 1.15(b).

The ODC called three witnesses at the hearing: an auditor investigator who testified regarding his investigation of Quigley's IOLTA account,[3] Harold Woodling, and Attorney Mark Primrose. Woodling testified that he knew Quigley for forty years and had retained him for legal work "on and off." N.T., 7/9/15, at 31. Woodling explained that he retained Quigley to handle the administration of his late wife's estate, Quigley was still handling it at the time of the hearing, and that Woodling did not recall agreeing Quigley could keep or borrow any of the money from his wife's estate. Id. at 31–33. On cross-examination, Woodling testified that he had lent Quigley $25,000.00 in 2006 which had not been reimbursed. Id. at 34–36. During redirect examination, Woodling testified that Quigley had specifically asked to borrow the $25,000.00 sum in

2. PNC Bank notified the Pennsylvania Lawyers Fund for Client Security of the overdraft which triggered the investigation into Quigley's handling of the account.

3. The testimony of the auditor investigator details his investigation and the summary he prepared for the disciplinary proceedings. See N.T., 7/9/15, at 19–28. As noted, Quigley stipulated to the fact that he mishandled client funds and violated the Rules of Professional Conduct.

2006, and Quigley did not ask to borrow any of the funds that arose from the settlement of his wife's estate in 2012. *Id.* at 38–39.

Primrose testified he and Quigley became law partners in 1988, but they dissolved the practice in the late 1990s over concerns with money. *Id.* at 41–42. Primrose explained that he and Quigley shared office space in the same building, but Quigley started to fall behind on his share of the expenses in 2010. *Id.* at 44. In 2011, Primrose purchased Quigley's one-half interest in the office building they shared, and in 2013, Quigley tendered a check to Primrose for $165,000.00 to be applied toward repurchasing his interest. *Id.* Primrose indicated that because Quigley was subject to an Internal Revenue Service (IRS) lien and had other past unreimbursed expenses owed to Primrose, that "nothing was finalized" regarding the repurchase.[4] *Id.* Primrose testified on cross-examination that Quigley was a competent attorney and had "a generally good reputation as a good trial attorney" in the community. *Id.* at 47. Following Primrose's testimony, the ODC rested.

Quigley testified he began practicing law in 1982, and detailed his career and involvement in community activities over the course of his career. *See id.* at 52–58, 62. Quigley testified that he employed his own bookkeeper from 1997 until she moved away in April 2013, and during the time she was employed, she managed the IOLTA account for him. *Id.* at 59–61. He began to experience financial strain in 2008 and 2009 following the market collapse, and sold apartment buildings that he owned in order to afford to maintain his practice. *Id.* at 60–61. However, in 2010, the IRS began filing liens against him because he failed to account for capital gains when he filed his taxes, and the IRS situation "continued to worsen" over the years. *Id.* at 61–64. Quigley testified that he began taking money out of his IOLTA account in 2013 in "piecemeal" amounts "based on need" in order to run his practice and to

4. At times during his testimony, without objection, Primrose read from a letter he prepared for the ODC detailing his professional relationship with Quigley. *See id.* at 43–44.

avoid detection from the IRS. *Id.* at 64, 68–69. He acknowledged his handling of the funds was "improper." *Id.* at 68.

Quigley attributed his mishandling of the funds to a combination of personal circumstances in 2013. Specifically, he cited his longtime bookkeeper leaving in the Spring of 2013, the dissolution of a seventeen-year romantic relationship in 2012 or 2013, and a decline in business due to a misprint of his office phone number in a phonebook advertisement which was printed in June 2013. *Id.* at 71–74. He testified that when the advertisement was corrected in the summer of 2014, his business improved, and he began paying back creditors. *Id.* at 75. However, with respect to the Woodling matter, Quigley averred that he had informed Woodling of the lien on his office building in 2012, and Woodling agreed to lend him the money. *Id.* at 82–83. He agreed it was improper to use Woodling's funds; however, he maintained the funds were used with the permission of Woodling. *Id.* at 84. On cross-examination, he speculated that Woodling, who was 84 years old at the time of the hearing, was unable to recall giving permission because of his "faulty memory." *Id.* at 88–89.

John Abbruzzese, Ph.D., a licensed psychologist, testified on behalf of Quigley. He testified he has known Quigley since the mid–1980s, and had a professional and personal relationship with him. *Id.* at 102–03. Dr. Abbruzzese met with Quigley for approximately two and one-half hours on July 19, 2015, and prepared a report of his conclusions based on that meeting. *Id.* at 103–04, 110. He opined that if Quigley had been seen by a psychologist in 2013 for the stressors he experienced, i.e., the loss of his bookkeeper, the dissolution of his long-term relationship, and the misprint in his phone book advertisement, he would have been diagnosed with depression and "some post-traumatic stress." *Id.* at 106–07. When asked by Quigley's counsel what effect those diagnoses would have on the mismanagement of client funds, Dr. Abbruzzese offered the following opinion.

Well, when a person suffers from either or both of those, there's no real ability to concentrate on anything. All you do is fly as best you can maybe on one wing and that's what

Mr. Quigley was doing, and he needed both wings to fly. And ... that I think is why he made whatever errors he allegedly made.

*Id.* at 107. He further opined that the mismanagement was not intentionally undertaken by Quigley; rather, "he was reacting to situations as they appeared but not as they really were, and that's part of the depression as well as the anxiety that goes with it[.]" *Id.* at 108. He expressed the belief that Quigley could continue to practice law but would benefit from "occasional therapy" to resolve emotional issues and prevent "another error down the line." *Id.* at 108–09. Dr. Abbruzzese speculated that the misconduct "probably would not have happened had there been someone to assist him. He failed to seek out the assistance at the time which may have helped him." *Id.* at 118.

On cross-examination, Dr. Abbruzzese emphasized that the events Quigley attributed to his misconduct were "three factors that assisted him in making misjudgments[.]" *Id.* at 119–120. Dr. Abbruzzese indicated that there was a "causal factor" between the events in Quigley's personal life in 2013 and his handling of client funds. *Id.* at 119. He testified that he believed Quigley was capable of holding client funds at present, but Quigley would need to "work a little harder to be more diligent about his finances and get out of debt." *Id.* at 123.

A member of the Hearing Committee asked whether Dr. Abbruzzese's opinion would change if any of the misconduct occurred before Quigley experienced the three stressors. Dr. Abbruzzese replied it would alter his opinion in the matter "because there wouldn't have been any basis for some of the actions that I would know of." *Id.* at 127.

Lastly, Attorney Jeffrey Valender, a friend and professional acquaintance of Quigley for approximately thirty years, testified. He praised Quigley's performance as a lawyer and characterized him as "excellent." *Id.* at 131. He testified that if Quigley were to continue to practice law, Valender would not find the disciplinary issues an impediment to referring clients

to Quigley because he did not believe the issue would reoccur in the future. *Id.* at 131–32.

On November 9, 2015, the Hearing Committee filed a report and recommendation. The Hearing Committee comprehensively detailed the stipulated facts of the case and the testimony presented. *See* Hr'g Comm. Report, 11/9/15, at 1–20. The Hearing Committee also made numerous findings of fact based on the stipulations and testimony presented including, inter alia, the following.

72. Mr. Woodling did not consent to allow [Quigley] to withdraw funds from his wife's estate to satisfy [Quigley's] personal obligation.

73. [Quigley] did not recommend that Mr. Woodling consult with other counsel concerning any request for a loan. Nor is there any paperwork or other writing documenting any loan.

74. [Quigley] has not fully repaid the funds that he borrowed from the Woodlings in or about 2006.

75. [Quigley] cooperated in the disciplinary proceeding, as evidenced by the extensive stipulation and admissions.

*Id.* at 31.

The Hearing Committee concluded that "[t]he serious nature of [Quigley's] mishandling of client funds, the fact that the defalcation extended over a number of years and the associated misrepresentations warrant the extreme sanction of disbarment." *Id.* at 34. The Hearing Committee did not find the personal difficulties Quigley experienced mitigated or diminished the serious nature of his conduct. *Id.* at 35. It highlighted that the resignation of Quigley's bookkeeper and the misprint in the phone book occurred after Quigley began comingling personal and client funds and after Quigley used the Woodling money to satisfy his lien on the office. *Id.*

Next, the Committee turned to Quigley's position that his depression and post-traumatic stress disorder warranted a lesser disciplinary disposition. The Committee concluded this position did not serve to mitigate his offenses on several bases. First, it determined that the testimony of Dr. Abbruzzese did

not demonstrate by clear and convincing evidence that there was a causal connection between Quigley's diagnoses and his conduct as required by *ODC v. Braun*, 520 Pa. 157, 553 A.2d 894 (1989). It found Dr. Abbruzzese's testimony "uncertain and therefore insufficient to demonstrate the requisite causal link." Hr'g Comm. Report, 11/9/15, at 36. Further, it highlighted that Dr. Abbruzzese's testimony revealed that he was not fully apprised of the details and extent of Quigley's misconduct. *Id.* The Committee found the opinion not credible because Dr. Abbruzzese testified his opinion would differ if the misconduct occurred prior to the onset of the three circumstances to which Quigley attributes his behavior, and the record showed that the commingling of client funds began before Quigley's bookkeeper resigned and before the misprint in the phone book advertisement occurred. *Id.* at 36. Finally, it took issue with Dr. Abbruzzese's testimony because "he failed to explain how he made the diagnosis or precisely how he determined that [Quigley's] misconduct related to the diagnosis." *Id.*

The Committee found that Quigley knowingly commingled personal and client funds for the purpose of avoiding detection by the IRS, and not as a result of his other personal circumstances. *Id.* at 37. Finally, the Committee rejected Quigley's argument that he should receive a lesser punishment because he has made restitution to his clients. The Committee acknowledged Quigley's cooperation and admissions; however, it noted that restitution in four of the five matters only occurred after the initiation of disciplinary proceedings. The Committee also noted that in the instant case, the professional violations involved a pattern of intentional misconduct involving numerous clients. *Id.* at 38. Therefore, the Committee unanimously recommended disbarment.

 Quigley filed exceptions to the recommendation with the Board. On April 7, 2016, the Board issued a report and recommendation agreeing with the assessment of the Hearing Committee, concluding Quigley violated Rules of Professional Conduct 1.3, 1.15(b) and (e), and 8.4(c), and recommending

disbarment. Quigley filed a petition for review with this Court, and we granted oral argument.

> In attorney discipline matters we exercise *de novo* review, and we are not bound by the findings and recommendations of the hearing committee or the Board, though we give them substantial deference. The ODC bears the burden of establishing attorney misconduct by a preponderance of the evidence. Because discipline is imposed on a case-by-case basis, we must consider the totality of facts presented, including any aggravating or mitigating factors.

*ODC v. Preski*, 635 Pa. 220, 134 A.3d 1027, 1031 (2016) (citations and some quotation marks omitted). "[T]he primary function of the attorney disciplinary system is not punitive in nature but is to determine the fitness of an attorney to continue the practice of law and maintain the integrity of the legal system." *ODC v. Cappuccio*, 616 Pa. 439, 48 A.3d 1231, 1238–39 (2012). The objective is to protect the public and courts from attorneys unfit to practice law. *Id.* There is no per se rule on disbarment when an attorney commingles client and personal funds. *ODC v. Monsour*, 549 Pa. 482, 701 A.2d 556, 558 (1997). However, "[m]isappropriation of client funds is a serious offense that may warrant disbarment." *Id.* (citations omitted). Indeed, "[a] client must ... rest assured that any financial transactions carried out on the client's behalf will be scrupulously honest, will be accounted for at the client's request, and will involve and [sic] immediate payment of funds that are due and owing to the client." *Id.* (citation omitted).

█ Quigley has stipulated to violating several Rules of Professional Conduct; hence, the only issue is whether his conduct warrants the most serious sanction of disbarment or some lesser form of discipline is appropriate. *See ODC v. Christie*, 536 Pa. 394, 639 A.2d 782, 786 (1994).

Quigley submits "that his mishandling of funds was more the result of negligence, poor record keeping, and a lack of understanding of trust account principles, rather than dishonesty." Quigley's Brief at 8. He acknowledges that Woodling offered contradictory testimony, but maintains it was his

"belief" that Woodling indeed permitted Quigley to use settlement funds for his own benefit. *Id.* at 11–12.

With respect to all of his clients, Quigley argues, although he committed ethical violations, he did not possess criminal intent to defraud clients, and all of his clients have been paid in full. *See id.* at 13, 15–17, 19–21, 26. He further notes he has no prior history of discipline, has accepted responsibility for his actions, and has taken remedial action to avoid misconduct in the future. *Id.* at 8, 15–16, 19. This Court is unpersuaded that these circumstances mitigate the serious violations Quigley committed, as Quigley's misconduct involved five separate clients over a three-year period. Further, he made full restitution to four of the clients only after disciplinary proceedings were initiated. *See ODC v. Knepp*, 497 Pa. 396, 441 A.2d 1197, 1201 (1982) (disbarment ordered for attorney who mishandled client monies and held insufficient funds in his escrow account over a four-year period, despite no previous disciplinary action; cooperating with investigators; demonstrating remorse; and returning client funds following initiation of disciplinary proceedings); *ODC v. Lucarini*, 504 Pa. 271, 472 A.2d 186, 186–91 (1983) (disbarment ordered for attorney who obtained clients' signatures and placed them on a settlement draft without their knowledge; mishandled and commingled client funds for a period of two years; and misrepresented to Disciplinary Counsel the mishandling, despite mitigating evidence of recovery from alcoholism; paying back clients; retaining an accountant to monitor and maintain integrity of escrow account; and the agreement of attorney's psychiatrist and several practicing attorneys to monitor his practice); *Monsour*, 701 A.2d at 557–60 (disbarment ordered for attorney who intentionally misappropriated client funds over a two-year period, despite ultimately stipulating to the offenses; paying clients in full after notification of disciplinary proceedings; and attempting, but failing, to demonstrate a causal connection between his misconduct and his alcohol abuse); *ODC v. Keller*, 509 Pa. 573, 506 A.2d 872, 879 (1986) (disbarment ordered for attorney who mishandled client funds between 1980–1982, including depositing a check with a forged

signature, despite evidence that he was a competent member of the bar preceding the period of misconduct; he had an acrimonious breakup with his brother/business partner after which he began exhibiting irrational behavior; and his psychologist's testimony in mitigation that attorney's emotional condition rendered him not responsible for the misconduct).[5]

■ Quigley also submits that his psychiatric condition was a causal factor in his misconduct, relying on the testimony of Dr. Abbruzzese. *See* Quigley's Brief at 21–27. In order for a psychiatric condition to be considered a mitigating factor in a disciplinary proceeding, the respondent must demonstrate by clear and convincing evidence that the condition was a causal factor to the misconduct. *Braun*, 553 A.2d at 895–96; *see Monsour*, 549 Pa. at 487–88, 701 A.2d at 559. The record supports the determinations of the Hearing Committee and the Disciplinary Board that Quigley failed to show the depression and post-traumatic stress he experienced were causal factors in his misconduct. Dr. Abbruzzese opined that the stressors experienced by Quigley in 2013 were a causal factor to his mismanagement of funds; however, he did not demonstrate an understanding of the violations or their specific timeframes. *See* N.T., 7/9/15, at 108–110. Moreover, his testimony was speculative, noting that had Quigley addressed his

5. We cannot agree with the Dissent's position that the mitigation evidence presented in the instant case was substantial. *See* Dissenting Op. at 616–18, 161 A.3d at 810–11. We are not unsympathetic to the personal hardships faced by Quigley which overlapped with his period of misconduct. However, we cannot overlook that Quigley's mismanagement of client funds with which he had been entrusted pre-dated two of the circumstances to which he attributes his misconduct, i.e., the resignation of his bookkeeper and the misprint of his advertisement. As we recognized in *Keller*,

> If we were here primarily concerned with a punishment of the individual, strong argument could be made in view of the circumstances surrounding the errant behavior.... However, as we previously noted, the focus is not upon Respondent but rather it is directed to the impact of his conduct upon the system and its effect on the perception of that system by the society it serves.

*Keller*, 506 A.2d at 877–78. The misuse of client funds in five separate matters, over three years by Quigley has compromised the integrity of the legal profession to a degree which warrants the sanction of disbarment.

issues, the violations "probably" would not have occurred. *Id.* at 118. Significantly, as pointed out by the Hearing Committee and the Board, Quigley's misconduct with regard to the Woodling matter predated the resignation of his bookkeeper and the misprint in the phone book advertisement. Dr. Abbruzzese testified that misconduct occurring prior to the onset of the three stressors Quigley experienced would change his professional opinion on causation. *Id.* at 127. Accordingly, we conclude Quigley failed to demonstrate a causal connection between his misconduct and a psychiatric disorder sufficient to constitute a lesser disciplinary sanction in this matter. *See Braun,* 553 A.2d at 895–96.

For these reasons, we adopt the recommendation of the Disciplinary Board and order Peter James Quigley disbarred from the practice of law in this Commonwealth. We further order Quigley to comply with the provisions of Pa.R.D.E. 217, and pay costs pursuant to Pa.R.D.E. 208(g).

Chief Justice Saylor and Justices Baer, Todd and Dougherty join the opinion.

Justice Donohue files a dissenting opinion in which Justice Wecht joins.

JUSTICE DONOHUE, Dissenting

I respectfully dissent from the Majority's decision to impose the sanction of disbarment on the record presented here. The essential purpose of our system of lawyer discipline is "to protect the public from unfit attorneys and to maintain the integrity of the legal system." *Office of Disciplinary Counsel v. Keller,* 509 Pa. 573, 506 A.2d 872, 875 (1986); *In re Oxman,* 496 Pa. 534, 437 A.2d 1169, 1174 (1981). While the aim of the disciplinary system is not intended to be punitive, sanctions are a necessary means to accomplish its end and are punitive in nature. *Office of Disciplinary Counsel v. Lucarini,* 504 Pa. 271, 472 A.2d 186, 190 (1983). At all times, we "must balance a concern for public welfare with a respect for the substantial interest that an attorney has in continuing his professional involvement in the practice of law...." *Office of Disciplinary*

*Counsel v. Kanuck*, 517 Pa. 160, 535 A.2d 69, 74 (1987) (quoting *Office of Disciplinary Counsel v. Lewis*, 493 Pa. 519, 426 A.2d 1138, 1142 (1981)).

Disbarment is an extreme sanction properly reserved for only the most egregious matters, as it constitutes a termination of the privilege to practice law without any promise of ultimate reinstatement. *Office of Disciplinary Counsel v. Cappuccio*, 616 Pa. 439, 48 A.3d 1231, 1238 (2012). On several occasions, this Court has held that misappropriation of client funds may warrant a sanction of disbarment, *see, e.g. Office of Disciplinary Counsel v. Monsour*, 549 Pa. 482, 701 A.2d 556, 558 (1997). *Office of Disciplinary Counsel v. Davis*, 532 Pa. 22, 614 A.2d 1116, 1117 (1992), *reinstatement granted sub nom. Matter of Davis*, 543 Pa. 318, 671 A.2d 222 (1996); *Keller*, 506 A.2d at 875; *Lucarini*, 472 A.2d at 190; *Office of Disciplinary Counsel v. Knepp*, 497 Pa. 396, 441 A.2d 1197, 1201 (1982), and Respondent, as a result of his egregious conduct, has thus exposed himself to the possibility of imposition of this severe punishment by virtue of his misdeeds.

This Court has declined, however, to create a per se rule that misappropriation of funds must result in disbarment, prescribing instead a standard by which we exercise our discretion through consideration of the facts and circumstances of each case individually. *See, e.g., Office of Disciplinary Counsel v. Chung*, 548 Pa. 108, 695 A.2d 405, 407 (1997) (citing *Lucarini*, 472 A.2d at 190); *Monsour*, 701 A.2d at 558. Accordingly, in every case this Court must conduct a de novo review to determine whether significant mitigating factors weigh against disbarment. *Office of Disciplinary Counsel v. Preski*, 635 Pa. 220, 134 A.3d 1027, 1031 (2016); *Office of Disciplinary Counsel v. Rainone*, 590 Pa. 15, 911 A.2d 920, 930 (2006).

The principal issue in this case is not whether Respondent committed multiple acts of mishandling client funds. In most instances he has admitted his guilt, and I agree with the Majority's cogent analysis with respect to the Disciplinary Board's conclusion that Respondent violated multiple provisions of the Pennsylvania Rules of Professional Conduct. Instead, the principal issue here is whether to impose a

lengthy suspension from the practice of law or the more extreme sanction of disbarment. The essential difference between these two sanctions is that while both sanctions involve the withdrawal of the privilege of practicing law, a suspended attorney may resume practice at the end of the period of suspension upon demonstration of his fitness to practice, whereas a disbarred attorney may not apply for readmission to the bar for a period of five years, and

> there is no basis for an expectation by the disbarred attorney of the right to resume practice at some future point in time. When reinstatement is sought by the disbarred attorney, the threshold question must be whether the magnitude of the breach of trust would permit the resumption of practice without a detrimental effect upon "the integrity and standing of the bar or the administration of justice nor subversive of the public interest."

*Matter of Renfroe*, 548 Pa. 101, 695 A.2d 401, 403 (1997) (citing *Keller*, 506 A.2d at 875). To make this determination, we must consider whether sufficient mitigating factors tilt in favor of the lesser sanction. *See, e.g., Chung*, 695 A.2d at 407 (holding that given the attorney's many years of significant community service, genuine remorse, and strong character evidence, a five-year suspension was appropriate sanction); *Office of Disciplinary Counsel v. Shorall*, 527 Pa. 413, 592 A.2d 1285, 1294 (1991) ("[I]n light of the evidence offered in mitigation, we believe that the ODC's pursuit of the extreme sanction of disbarment is [ ] inappropriate as being too severe and unjustified."); *Office of Disciplinary Counsel v. Kanuck*, 517 Pa. 160, 535 A.2d 69, 76 (1987) (holding that where the attorney did not intend to embezzle his clients' funds and made restitution in every instance, a five year suspension was appropriate sanction).

Respondent refers this Court to substantial mitigating evidence in support of his request for the imposition of a lesser sanction than disbarment. He notes that he was never charged with any crimes and denies that any of his acknowledged misdeeds were committed with any criminal intent. Respondent's Brief at 12, 15, 17, 19, 25–26. He also denies that he

ever acted maliciously or intentionally to cause harm to his clients, and that upon being made aware by the Disciplinary Board of shortcomings in his IOLTA account, he immediately took the necessary remedial steps to make each of his clients whole and to bring his IOLTA account into trust. *Id.* at 2, 16. Respondent indicates that none of his clients brought claims of wrongdoing against him. *Id.* at 4. In addition, he references the favorable character evidence he presented, demonstrating that he is well respected in his legal community, having practiced for more than thirty-two years without any history or incidents of prior disciplinary violations. *Id.* at 2, 4, 16, 26. He cooperated throughout the entirety of the disciplinary process, stipulating to the majority of the allegations against him. *Id.* at 4. Finally, Respondent has expressed deep remorse for his actions, which he fully acknowledges were "quite disturbing," "not becoming of a member of the bar," and involved "egregious misconduct." *Id.* at 16, 25–26.

In contrast, in the cases cited above, including *Monsour*, *Davis*, *Keller*, *Lucarini*, and *Knepp*, in which the sanction of disbarment was imposed for the misappropriation or mishandling of client funds, the attorneys typically offered relatively little mitigation evidence. Davis blamed "careless office procedures" for his intentional misconduct. *Davis*, 614 A.2d at 1122. Keller offered only evidence of a disturbed emotional state, brought on by the dissolution of his business relationship with his brother. *Keller*, 506 A.2d at 877. Monsour and Lucarini presented evidence of an untreated alcoholism condition. *Monsour*, 701 A.2d at 558–59; *Lucarini*, 472 A.2d at 187. Knepp contended that he was driven to his misdeeds because of "financial difficulties" and "a desire to maintain an image of solvency." *Knepp*, 441 A.2d at 1201. In addition, unlike here, these cases involved additional misconduct, such as forging clients' signatures (*Keller* and *Lucarini* ), counseling clients to undertake dishonest acts in court proceedings and deceitful use of an affidavit (*Davis* ), disobeying a court order (*Monsour* ), charging excessive legal fees (*Knepp* ), and failing to act diligently and lying to conceal the transgression (*Keller* and *Knepp* ).

In my view, the mitigating factors present here, including Respondent's immediate efforts to make his clients whole, his length of practice without a disciplinary history, his age (sixty), his cooperation throughout the disciplinary process, and his remorse and recognition of the seriousness and wrongfulness of his conduct, when taken together, provide a substantial counterweight to lessen the severity of his conduct so to justify a form of discipline less than disbarment. As a result, I respectfully dissent from the learned Majority's decision to impose this sanction, and would instead suspend Respondent from the practice of law for a period of five years.

Justice Wecht joins this dissenting opinion.